J-S23002-21 & J-S23003-21

2021 PA Super 227

| IN THE INTEREST OF: LA.-RA. W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 354 EDA 2021 |

Appeal from the Order Entered January 27, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001437-2019

| IN THE INTEREST OF: LY.-RO. W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: C.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 359 EDA 2021 |

Appeal from the Order Entered January 27, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001438-2019

| IN THE INTEREST OF: LA.-RA. W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 478 EDA 2021 |

Appeal from the Order Entered January 27, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001437-2019

| IN THE INTEREST OF: LY. -RO. W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 479 EDA 2021 |

Appeal from the Order Entered January 27, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001438-2019


BEFORE:   LAZARUS, J., KUNSELMAN, J., and COLINS, J.[*]

OPINION BY LAZARUS, J.:                    **FILED NOVEMBER 22, 2021**

C.W. (Father) and S.P. (Mother) (collectively, Parents) appeal[1] from the trial court's adjudicatory and dispositional orders finding that Parents'[2] then-eight-week-old twin children, Ly. -Ro. W. and La.-Ra. W. (collectively, Children) (born 6/2019), were dependent[3] and the victims of child abuse. After careful review, we affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] We have *sua sponte* consolidated Mother's and Father's appeals.  **See** Pa.R.A.P. 513.

[2] On March 10, 2021, the trial court consolidated Father's appeals for each twin *sua sponte*.

[3] In **In re R.J.T.**, 9 A.3d 1179 (Pa. 2010), the Supreme Court set forth the proper standard of review in dependency cases as follows:

> [T]he proper standard of review in dependency cases is whether the trial court abused its discretion, noting that the appellate court

*(Footnote Continued Next Page)*

Children were born, full-term,[4] in June 2019; each twin weighed over 5 pounds at birth. On August 7, 2019, the Department of Human Services (DHS) received a Child Protective Services (CPS) investigation report[5] indicating that Parents had taken La. -Ra. W. (Child) to the Children's Hospital of Philadelphia (CHOP) after Mother noticed swelling in Child's right thigh the day before and also observed that Child had been fussy during diaper changes

_____

> must accept the facts as found by the trial court, unless they are not supported by the record, but that the court is not bound by the court's inferences or legal conclusions.

*Id.* at 1185 (citations omitted).

[4] A pediatric doctor testified that the twins were full-term, having been born past 37 weeks' gestation. N.T. Dependency/Abuse Hearing, 9/23/20, at 72.

[5] The report, which was deemed "indicated," listed the outcome of its investigation as follows:

> CPS allegations indicated. Both parents have denied allegations of physical abuse[;] however, Child age[d two-]months old was found to have [two] fractured femurs and [P]arents have been unable to provide any explanations of how injury occurred. Following medical evaluation and tests, [C]hild was found to have no pre-existing medical conditions that may have caused injuries and [P]arents have denied that [C]hild has had any recent accidents, falls, or other accidental traumas. Following [magnetic resonance imaging, or] MRI, Child was also found to have a subdural hematoma (bleeding in space between brain and skull). Medical reports indicate that [C]hild's injuries are consistent with non-accidental trauma/[]child physical abuse. Parents report that they have been the primary caregivers of both [C]hild and [her] twin since birth.

CPS Investigation Report, 8/7/19, at 2.

for the prior two to three days.[6]  N.T. Dependency/Abuse Hearing, 1/27/21, at 172, 175.  Following an x-ray and magnetic resonance imaging (MRI), Child was diagnosed with a right femur fracture (with some signs of healing) and a bilateral, thin subdural hematoma.  CHOP doctors also conducted a sibling evaluation for Child's twin, Ly. -Ro. W., that revealed no signs of trauma or fractures.  *Id.*, 9/23/20, at 49.

DHS social workers met with Parents twice at CHOP; Parents consistently denied knowledge of Child having had any accidental trauma, including falls, drops or bumps.  *Id.* at 34.  Mother stated that she laid La. – Ra. down for a nap around 1:00 PM and that La. -Ra. woke up at 3:30 PM. When La. -Ra. awoke Mother noticed swelling on Child's right leg.  Parents are Children's primary caregivers; at the time Children were injured, Father worked full-time for United Parcel Service (UPS) and Mother was a stay-at-home mom.[7]  *Id.* at 34; *Id.*, 1/27/21, at 170-71.  Parents and Children reside with paternal great-grandfather and paternal aunt.  Paternal great-grandfather does not look after Children; paternal aunt "sometimes look[s] after [] Children while [Mother] takes a shower or for a few minutes at a time[,] but did not provide care for [] Children."  Trial Court Opinion, 4/22/21,

---

[6] Father testified that Child would normally cry a little when he changed her diaper or when he would put her in a onesie.  He also testified that Child's twin, Ly.-Ro. W., would not cry during diaper changes.

[7] At the January 27, 2021 hearing, Children's CUA caseworker testified that Mother was employed by Amazon and Father was working at a pizza shop. N.T. Dependency/Abuse Hearing, 1/27/21, at 16.

at 4; N.T. Abuse/Dependency Hearing, 1/27/21 at 171-72. Children had no babysitters.[8] N.T. Dependency/Abuse Hearing, 1/27/21, at 134-35, 171.

After reviewing x-rays and consulting with the Child Protection Team at CHOP, Dr. Colleen Bennett, the CHOP Attending Physician in Child Abuse Pediatrics and a qualified expert in child abuse, opined that Child's femur fracture was the result of significant force being applied to Child's leg (known as an "oblique" fracture), most likely in a twisting motion. Both bone health tests[9] and genetics testing were conducted; all test results were negative. Doctor Bennett ruled out that the fracture was a birth injury, self-inflicted injury, or the result of a genetic condition. *Id.*, 9/23/20, at 31, 33-34, 36, 43. The expert concluded that the fracture, which she deemed significant, "had some signs of healing[,]" which typically occurs in injuries sustained seven days to two weeks prior. *Id.* at 32. Moreover, Dr. Bennett opined that the fracture was not the type of injury that occurs when a baby puts his or her legs outside of a crib because they are not able to roll or move in the crib at eight-weeks-old. *Id.* at 34-36.

Similarly, Dr. Bennett opined, after reviewing x-rays and a brain MRI, that Child's hematoma was most likely not a result of birth trauma, a metabolic

---

[8] Mother did testify that Children were with their Godfather on July 4, 2019, for approximately three hours and in the care of paternal aunt on August 1, 2019, for an hour or two. N.T. Dependency/Abuse Hearing, 1/27/21, at 171.

[9] These tests checked Child's calcium, vitamin D, magnesium, and phosphorus levels; all levels were normal. Doctor Bennett also testified that doctors considered rickets and a vitamin D deficiency for both twins, but there was no finding on x-rays for the conditions.

- 5 -

disorder, or a self-inflicted injury, *id.* at 39-40, 43, but was most likely caused by violent force as a result of the head moving back and forth. *Id.* at 41. CHOP doctors also did a blood workup to evaluate the cause of the bleeding and to check for rare bleedings disorders; the workup was negative. *Id.* at 38-40. CHOP experts concluded that Child's injuries were non-accidental trauma, indicative of child abuse.[10] *Id.* at 42. CYS' investigation report, deemed "indicated," identified Child as a victim of child abuse based upon medical evidence, and Parents as the "alleged perpetrators/responsible person[s]." CYS Investigation Report, 8/7/21, at 2. Accordingly, Children were discharged to maternal aunt's care with a safety plan in place.

On August 21, 2019, a follow-up skeletal survey revealed that Child's twin, Ly. -Ro. W., had a healing posterior fracture to her sixth rib on the left side.[11] *Id.* at 45, 50. This injury was similarly unexplained[12] and "highly concerning for non-accidental trauma or physical abuse." Trial Court Opinion, 4/2/21, at 6; *see also* N.T. Dependency/Abuse Hearing, 9/23/20, at 48, 58; *id.*, 1/27/21, at 139-40. Doctor Bennett testified that posterior rib fractures

---

[10] The CYS Investigation Report specifically listed the "category of abuse/neglect" as "causing bodily injury to child through recent act/failure to act." CYS Investigation Report, 8/7/19, at 2.

[11] CHOP doctors were unable to determine when this rib fracture occurred.

[12] Doctor Bennett testified that Ly. -Ro. W's rib fracture could have been present during the initial skeletal survey conducted on August 7, 2019, as it is not uncommon to find additional injuries or clarifying initial injuries on follow-up exams.

are rarely accidental and are highly specific for abuse; she also indicated that CHOP doctors had ruled out any metabolic bone conditions as the reason for this particular fracture. *Id.*, 9/23/20, at 50, 54-55. Finally, Doctor Bennett testified that there are often no external signs of trauma (i.e., bruising or swelling) with rib fractures. *Id.*

An August 21, 2019 repeat skeletal survey for Child revealed a second fracture—this time to the left femur—that was healing. *Id.* at 45; *id.*, 1/27/21, at 132.[13] Parents again denied any knowledge of how these injuries occurred to Children and also denied any history of drug or alcohol use or any mental health concerns. *Id.* at 185. CYS prepared another report, dated August 21, 2019, listing Ly.-Ro. W. as a victim of child abuse and Parents as the abusers; the information in the report listed Parents as the alleged "perpetrators/responsible persons."[14] The report was deemed "indicated." The Community Umbrella Agency (CUA) gave Parents the following objectives:

_____

[13] Doctor Bennett also testified that "from the follow-up survey[,] . . . in retrospect there w[ere] likely some signs of healing of the left femur at the time of the initial skeletal survey. So it was likely present at th[e] time [of the initial survey,] but subtle[,] and became more obvious on the follow[-]up skeletal survey." *Id.* at 45-46.

[14] Unlike CYS' prior report, dated August 7, 2019, its August 21, 2019 report states "unknown" with regard to a third alleged perpetrator [(AP)]/responsible person, noting that "AP's have been identified. Unfounded unknown AP." CYS Investigation Report, 9/21/19, at 1-2. The August 21st report lists a sibling and legal guardian as other members of Children's household. *Id.* The report also notes that "Per re-evaluation from 9/6/19, both MOT[HER] and FAT[HER] have been added as perpetrators and both have been indicated." *Id.*

parenting classes, one-hour supervised visits[15] with Children at CUA, and weekly meetings with a CUA worker. *Id.* at 183-84. Parents consistently attended supervised visits with Children and completed parenting classes. Children remained in kinship care.

On September 9, 2019, DHS filed dependency petitions for Children alleging that it "has determined that there is [a] sufficient basis to find that aggravating circumstances exist [in the matter] pursuant to 42 Pa.C.S. § 6302 (aggravating circumstances (2))," where Children "have been [] victim[s] of physical abuse resulting in serious bodily injury by [Parents]." DHS Dependency Petitions, 9/9/19, at ¶¶ 5(l)-(m). An adjudicatory hearing was scheduled for September 18, 2014; when Parents contested the hearing, the hearing was deferred. On September 23, 2020, the court held the first of two bifurcated adjudicatory/child abuse hearings. At the first hearing, Dr. Bennett, Dr. Marvin Miller, Greg Williams, Dr. Susan Nagal-Gootnick (Dr. Gootnick),[16] Mother, and Father testified.

Doctor Bennett, a CHOP attending physician in child abuse pediatrics who was one of Child's consulting physicians in the CHOP emergency department on August 6th, testified as DHS's expert witness. Doctor Miller, a pediatrician at Dayton Children's Hospital, testified as an expert on behalf of

---

[15] In October 2019, Mother violated the court's visitation order when she attended a family gathering where Children were present. *See* N.T. Dependency/Abuse Hearing, 9/23/20, at 341-42.

[16] The parties and briefs refer to Dr. Nagal-Gootnick as Dr. Gootnick, so we will refer to her by the latter name throughout this decision.

Mother.[17]  However, the trial court ultimately struck Dr. Miller's testimony as inadmissible in response to DHS's *Frye*[18] motion, concluding that Dr. Miller's theory of Temporary Brittle Bone Disease (TBBD) (also known as metabolic bone disease of infancy (MBDI)), which he proposed was the mechanism of injury to Children, is a legitimately disputed theory that is not generally accepted in the medical community.  Greg Williams, Children's assigned CUA case manager, who testified on behalf of DHS with regard to Children's placement and safety, noted that Children are thriving in kinship care with a family friend.  N.T. Dependency/Abuse Hearing, 9/23/20, at 339.  Doctor Gootnick, a board-certified radiologist and expert in pediatric radiology, testified for Mother.  However, the trial court ultimately struck Dr. Gootnick's testimony, exhibits, and April 15, 2020 expert report.  The court concluded that Dr. Gootnick's expert report was modified without her knowledge and, thus, it "goes to the very heart of her credibility and the very heart of the

_____

[17] The court was unable to determine exactly in what area Dr. Miller was an expert.  All parties agreed that he was qualified as a geneticist.  N.T. Dependency/Abuse Hearing, 9/23/20, at 203, 207.  However, DHS claimed that the doctor was not an expert in pediatric radiology.

[18] *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).  *Frye* set forth the requirement that in order for an expert's testimony to be admissible, his or her methodology must be generally accepted in the relevant field.  *See also* Pa.R.E. 702.  *Frye* was adopted in Pennsylvania in *Commonwealth v. Topa*, 369 A.2d 1277 (Pa. 1977).  Later, in *Grady v. Frito-Lay, Inc.*, 839 A.2d 1038 (Pa. 2003), the Pennsylvania Supreme Court clarified that the *Frye* rule "applies to an expert's method, not his [or her] conclusions."  *Id.* at 1047.

credibility of the documents offered to this [c]ourt." Trial Court Opinion, 4/22/21, at 31.

On October 23, 2020, mid-trial, and at the direction of the trial judge at the September 23rd hearing, DHS filed a motion to exclude Drs. Miller's and Gootnick's expert testimony based on *Frye*. In its motion, DHS argued that Dr. Miller failed to opine, to a reasonable degree of medical certainty, as is required under Pennsylvania law. *See Frye* Motion, 10/23/20, at 7; *see also* Pa.R.E. 702[19] (controlling admissibility of expert testimony). DHS also contended that Dr. Miller's theory of MBDI has been rejected by numerous courts, that too much of an analytical gap existed between his data and medical conclusions, that MBDI is not generally accepted in the medical community and is not included in medical textbooks, and prominent medical associations and peer-reviewed publications have rejected his theory. *See*

---

[19] Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> **(c) the expert's methodology is generally accepted in the relevant field.**

Pa.R.E. 702 (emphasis added). Rule 702(c) embodies the *Frye* rule.

*Frye* Motion, *supra* at 8-10. Finally, in a footnote in its motion, DHS sought to preclude Dr. Gootnick's report where she "review[ed] and reli[ed] on Dr. Miller's reports when assessing Children's injuries and ultimately arriving at her opinion." *Id.* at 7 n.3.

On January 27, 2021,[20] at the second dependency/child abuse hearing, DHS caseworker Sherene Cryor, Mr. Williams,[21] Dr. Bennett, Dr. Gootnick, Mother, and Father testified. Following the second hearing, the Children were adjudicated dependent; the court found that Children were" "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [their] physical, mental, or emotional health or morals." *See* 42 Pa.C.S. § 6302. Based on medical expert testimony adduced at the hearings, the court also determined that the Children were victims of child abuse, *see* 23 Pa.C.S. § 6303(b.1), and that, based on founded reports, clear and convincing evidence established that Parents were the abusers. The trial judge specifically discredited Parents' testimony about whether pressure during diaper changes could cause femur fractures, stating that "it appeared clearly that they were fed that line as part of an attempt to explain away the mechanism of the injury of the children." N.T. Dependency/Abuse Hearing,

---

[20] On November 18, 2020, the court scheduled the second of the two bifurcated hearings for January 27, 2021.

[21] Mr. Williams testified that while kinship care was going well, foster parent had submitted her 30-day notice of her intention to terminate the placement and the CUA was in the process of locating another placement for Children. N.T. Dependency/Abuse Hearing, 1/27/21, at 13.

1/27/21, at 212. Finally, the court emphasized that despite the finding of abuse with regard to Parents, "the goal is still a reunification." *Id.* at 211. To that end, the court advised that the CUA and/or Child Advocate look at parenting resources for Parents and also ordered visits with Children be supervised by their kinship caregiver. *Id.* at 214-15. Custody of Children was transferred to DHS.

Father filed a timely notice of appeal from the trial court's final order, as well as a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On appeal, Father presents the following issues for our review:

(1) Whether the trial court erred as a matter of law or abused its discretion when it determined that [Children] were the victims of child abuse, and that [Father] was responsible for that abuse.

(2) Whether the trial court erred as a matter of law or abused its discretion when it ruled the expert testimony of Dr. Marvin Miller and Dr. Susan Gootnick inadmissible.

(3) Whether the trial court erred as a matter of law where it determined that [] Children met the definition of dependent children.

(4) Whether the trial court erred as a matter of law and abused its discretion when it ordered that it was clearly necessary to remove [] Children from [P]arents' care.

Father's Brief, at 3. Mother presents the following issues for our consideration:

(1) Did the trial court err as a matter of law and abuse its discretion when it made a finding of child abuse under the Child Protective Services Law ([]CPSL[]) and that [] Mother was responsible for such abuse[?]

- 12 -

(2) Did the trial court err as a matter of law and abuse its discretion by making a finding of child abuse against [Mother] under the CPSL, where DHS failed to establish by clear and convincing evidence that the Child's injury was [the result of] child abuse, as defined by 23 Pa.C.S. § 6303(b.1)[?]

(3) Did the trial court err as a matter of law and abuse its discretion by making a finding of child abuse against [Mother] under the CPSL, where [DHS] failed to establish by clear and convincing evidence that [Mother] acted intentionally, knowingly, or recklessly or that [Mother] caused any harm or created a risk of harm to [] Children, as required by 23 Pa.C.S. § 6303(b.1)[?]

(4) Did the trial court err as a matter of law and abuse its discretion when it ruled the expert testimony of Dr. Marvin Miller and Dr. Susan Gootnick inadmissible[?]

(5) Did the trial court err as a matter of law and abuse its discretion when it adjudicated [] Children dependent under the Juvenile Act, 42 Pa.C.S. § 6302, where the evidence was that Mother was fully engaged with her [s]ingle [c]ase [p]lan goals for over a year, was fully compliant with visits and medical appointments for [] Children, was well-bonded to [] Children and appropriate with Children on supervised visits, and where the only evidence [] Children were without proper parental care and control was alleged physical abuse occurring more than [one] year prior[?]

(6) Did the trial court err as a matter of law and abuse its discretion when it entered a finding that it was "clearly necessary" for [] Children to be removed from the care of [Mother], where the evidence was that Mother was fully engaged with her [s]ingle [c]ase [p]lan goals for over a year, was fully compliant with visits and medical appointments for [] Children, and was well-bonded to [] Children and appropriate with [] Children during supervised visits[?]

(7) Did the trial court commit an error of law and abuse of discretion when it entered a finding that DHS made reasonable efforts to prevent or eliminate the need for removal of [] Children from Mother's care[?]

Mother's Brief, at 8-9 (renumbered for ease of disposition).

Father and Mother first claim that the trial court abused its discretion and erred as a matter of law when it made a finding of child abuse and concluded that Parents were responsible for such abuse.

When a court's adjudication of dependency is premised upon physical abuse, its finding of abuse must be supported by clear and convincing evidence. *In the Interest of J.R.W.*, 631 A.2d 1019 (Pa. Super. 1993). Clear and convincing evidence exists when testimony given is so "clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *In re: J.C.*, 232 A.3d 886, 894 (Pa. Super. 2020).

Instantly, the trial court concluded that:

[A]fter examining and treating [] Children at CHOP, [Dr. Bennett] opined[, to a reasonable degree of medical certainty, that] Children did not have an underlying genetic condition or underlying bone condition that may have caused the injures and the parents denied any family history of bone disease. D[octo]r Bennett opined [] Children's injuries were most consistent with abuse, and this [c]ourt relied on that opinion to find the injuries to both Children were the result of child abuse, and [a]djudicated [] Children [d]ependent pursuant to 23 Pa.C.S. § 6303(b.1)(1). This [c]ourt found the Children were victims of child abuse as to Mother and as to Father, and [r]eports dated 8/07/[]19 and 8/21/[]19 founded as to both parents.

This [c]ourt adjudicated [] Children [d]ependent based upon the present inability of the parents, the Mother and Father, to provide safety, and was authorized to make a separate finding of child abuse for [] Children under the [CPSL], which provides that a local child services agency investigating child abuse may institute

dependency proceedings in which it petitions for [a] finding of child abuse. 23 Pa.C.S. § 6370(b)(2)(i).[22]

Trial Court Opinion, 4/22/21, at 38-39 (footnote omitted).

In cases where there is no direct evidence to identify the perpetrator of abuse, but the injured child was in a particular responsible party's care when the abuse occurred, Pennsylvania courts rely upon the evidentiary presumption set forth in 23 Pa.C.S. § 6381(d). Section 6381(d) provides that:

> Evidence that a child has suffered abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S. § 6381(d). **See In the interest of J.R.W.**, **supra** at 1023 (section 6381(d) "provides for an 'attenuated' standard of evidence in making a legal determination as to the abuser in child abuse cases [where] a child has suffered serious physical injury . . . as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child"); **see also In the Interest of L.Z.**, 111 A.3d 1164, 1167 (Pa. 2015) ("[T]he fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible.").

Citing to Commonwealth Court decisions, Mother claims that because the section 6381(d) presumption was not raised at any point during the proceedings and because the trial court did not enter any findings with regard

_____

[22] **See** 23 Pa.C.S. § 6370(b)(2)(i) (if county agency deems it appropriate in dependency proceeding, agency may petition court under Chapter 63 for finding of child abuse).

to section 6381(d), the claim is waived. Mother's Brief, at 32, 74. *See J.W. Dep't of Pub. Welfare*, 9 A.3d 270, 272-73 (Pa. Commw. Ct. 2010). We disagree.

Because the Superior Court is not bound by Commonwealth Court decisions, we decline to follow the cases Mother cites for waiver, especially where the Superior Court has not spoken on the issue and where the language in the evidentiary presumption is mandatory. *See Commonwealth v. Lewis*, 718 A.2d 1262, 1265 n.10 (Pa. Super. 1998) (Superior Court need not be bound by Commonwealth Court decisions). Instantly, we agree with DHS that the presumption is self-executing where DHS' evidence clearly and convincingly provided the requisite elements under section 6381(d) and where Parents were given the opportunity to present rebuttal evidence through expert witnesses, albeit that testimony was ultimately deemed inadmissible. *See* 23 Pa.C.S. § 6381(d) (once county agency demonstrates clear and convincing evidence that child has "suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent," *it is presumed* that parent or other responsible adult is perpetrator of abuse). Moreover, in response to Mother's fourth issue on appeal, since the section 6381(d) presumption applies, the court was not required to determine the perpetrators' level of culpability under section 6303. *See In re C.B.*, 2021 PA Super 189, *21 (Pa. Super. 2021) (trial court's culpability finding that abuse inflicted "recklessly" was superfluous where,

under section 6381(d), "fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible").

Here, it is not disputed that Parents were the sole caregivers responsible for Children's welfare. In addition, DHS' medical expert, Dr. Bennett, testified that the injuries suffered by Children were, to a reasonable degree of medical certainty, non-accidental trauma. Finally, the court concluded that the injuries were of such a nature that they "would ordinarily not be sustained or exist except by reason of the acts or omissions of" Parents. 23 Pa.C.S. § 6381(d). Under such circumstances, where Parents failed to rebut the *prima facie* presumption, DHS has succeeded in proving that Mother and Father were perpetrators of abuse. **C.B.**, **supra** (trial court properly concluded parents were perpetrators of abuse under CPSL, where their 5-month-old child suffered injuries that were non-accidental trauma, injuries occurred while parents were responsible for child's welfare, and neither parent could provide explanation of how injuries occurred). The case before us is precisely the situation in which the General Assembly intended the presumption be applied. **In re J.R.W.**, **supra** at 1023 (presumption protects those innocent victims of abuse who are "too young . . . to describe their abuse" and necessary in cases where "agencies [are left] . . . to prove their case with only physical evidence of injuries that would not ordinarily be sustained but for the action of the parents or responsible persons").

Both Father and Mother next claim that the trial court erred in ruling the testimony of Doctors Miller and Gootnick inadmissible.[23]  Specifically, they claim that Dr. Miller offered his opinion, that Children had weakened bones due to metabolic bone disease, to a reasonable degree of medical certainty. Mother also claims that the court improperly struck Dr. Gootnick's testimony, expert report and exhibits in their entirety.  We disagree.

Instantly, the trial court excluded Dr. Miller's testimony after concluding that it did not meet the **Frye** standard.  When reviewing a trial court's grant or denial of a **Frye** motion, an abuse of discretion standard applies.  **Betz v. Pneumo Abex LLC**, 44 A.3d 27, 54 (Pa. 2012).   It is the function of an appellate court to determine whether the trial court's decision to exclude Dr. Miller's testimony under **Frye** constituted unreasonableness, or partiality, prejudice, bias, or ill-will, or such a lack of support so as to be clearly erroneous.  **Grady v. Frito-Lay, Inc.**, 839 A.2d 1038, 1046 (Pa. 2003) (citation omitted).

"[E]videntiary rulings are within the general province of the trial courts and will not be overturned by an appellate court absent an abuse of discretion,

_____

[23] Father makes no specific argument regarding the trial court improperly excluding Dr. Gootnick's testimony other than piggybacking it onto the general statement that, with respect to the testimony of Dr. Gootnick and Dr. Miller, the court "erred[] in that it did not follow the **Frye** standard, which is the standard in Pennsylvania."  Father's Brief, at 32.  However, the court did not exclude Dr. Gootnick's testimony based on **Frye**, but did so because it found the expert's testimony tainted.  Thus, we find that Father has failed to preserve any claimed error with the court's exclusion of Dr. Gootnick's testimony, report, and exhibit.

as, for example, when the law is overridden or misapplied." ***Commonwealth v. Maconeghy***, 171 A.3d 707, 712 (Pa. 2017) (citation omitted). "With respect to novel scientific evidence, however, this discretion is tempered by the standard established in ***Frye***[, ***supra***.]" ***Thomas v. W. Bend Co.***, 760 A.3d 1174, 1178 (Pa. Super. 2000). The ***Frye*** test assesses "the general validity of a scientific method." ***Id.***, citing ***Topa***, ***supra*** at 1282.

In the seminal case, ***Frye***, the District Court for the District of Columbia created the requirement that the proponent of expert evidence demonstrate that the methodology used by the expert to reach his or her scientific conclusions is generally accepted by scientists in the relevant field, as well as provide other evidence of acceptance (i.e., textbooks) for it to be admissible. Pennsylvania adopted ***Frye*** in ***Topa***, ***supra***. Later, in ***Grady***, ***supra***, the Pennsylvania Supreme Court clarified that the ***Frye*** rule "applies to an expert's method, not his [or her] conclusions." ***Id.*** at 1047. ***See also Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579, 593 (1993) ("Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified[.]").

Courts accept a variety of sources as evidence that an expert's methodology is generally accepted, including judicial opinions, scientific publications, studies and statistics, expert testimony, or a combination of the above. ***In the Interest of M.R.***, 247 A.3d 1113, 1123 (Pa. Super. 2021) (citing ***Commonwealth v. Hopkins***, 231 A.3d 855, 872 (Pa. Super. 2020)). ***See also Commonwealth v. Walker***, 92 A.3d 766, 782-84 (Pa. 2014)

(scientific evidence, in form of peer-reviewed studies and meta-analyses, demonstrated fallibility of eyewitness identification testimony; use of eyewitness expert testimony has gained substantial acceptance by courts nationally); *Commonwealth Nevels*, 203 A.3d 229, 238-39 (Pa. Super. 2019) (discussing unpublished Superior Court cases upholding convictions where expert testimony regarding historical cell-site analysis introduced into evidence); *Commonwealth v. Blasioli*, 713 A.2d 1117, 1126-27 (Pa. 1998) (at *Frye* hearing in DNA forensic analysis case, Commonwealth presented numerous scientific texts and journals and testimony of university professors of human genetics and statistics, including statistical expressions based upon product rule and ceiling principle, on general acceptance of product rule in relevant scientific disciplines). Finally, an expert's personal belief, standing alone, is not sufficient proof that his or her methodology is generally accepted. *Hopkins*, *supra* at 872,

"Whether a witness is qualified to render opinions and whether his [or her] testimony passes the *Frye* test are two distinct inquiries that must be raised and developed separately by the parties[] and ruled upon separately by the trial courts." *Grady*, 839 A.2d at 1045–46; Pa.R.E. 702 (admissibility of expert testimony).

Recently, in *M.R.*, *supra*, our Court deemed inadmissible Dr. Miller's expert testimony that his theory, MBDI, rather than abuse, was a plausible explanation for three-month-old male twins' multiple, unexplained fractures. *Id.* at 1115. Specifically, our Court concluded that it was error for the trial

court to admit Dr. Miller's testimony where the doctor's methodology was not generally accepted in the medical field. *See id.* at 1132 (Court concurring with DHS' position that "the mere fact of publication is not enough to establish general acceptance, especially where the medical establishment's reaction to those publications has been opprobrium and concern over the misuse of T[emporary] B[rittle] B[one] D[isease]/MBDI in the courtroom"). Moreover, the Court rejected the trial court's determination that Dr. Miller used the same scientific methodology as CHOP and Nemours, Alfred I. DuPont doctors where Dr. Miller's method of interpreting the twins' x-rays was, itself, not generally accepted and where Dr. Miller and his consulting radiologist viewed them "in a compressed version on PowerPoint instead of using the proper imaging equipment." *Id.* at 1133. Moreover, the Court noted that Dr. Miller had not interpreted the x-rays correctly, where he had labeled normal, healthy features as evidence of rickets or other bone defects. *Id.* Finally, the Court debunked Dr. Miller's claim that he relied on "diagnostic testing" and "medical histories," where, "in reality, his opinion was not based on any diagnostic testing, as that testing had been ruled out by any medical risk factors for bone fragility[.]" *Id.*

Similarly, in this case, Dr. Miller presented MBDI as the cause of Children's unexplained injuries, presenting himself as someone who had studied infant bone disorders for the last 26 years and evaluated over 900 infants with unexplained injuries. N.T. Dependency/Abuse Hearing, 9/23/20, at 189, 287. Doctor Miller acknowledged, however, that his theory, MBDI,

- 21 -

has been negatively reviewed in child abuse and pediatric radiology journals and that the child abuse expert community does not accept his theory. *Id.* at 197-98.

Doctor Miller testified that in the instant case, he reviewed Mother's pregnancy and delivery history, Children's past medical history, discs of imaging studies (skeletal surveys/x-rays of bones), and conducted a 15-minute video conference with Mother on December 20, 2019, during which he diagnosed she had Temporomandibular Joint Disfunction (TMJ). *Id.* at 209-20. He testified that after examining all of the above histories and images, he "found multiple risk factors for fragile bones or what [he] call[s] metabolic bone disease of infancy." *Id.* at 210. The risk factors he listed were that Children were twins, they were breech at birth, they had very short umbilical cords, Mother was on magnesium prior to delivery, Mother had low levels of calcium and high alpha phosphatase in her third-trimester of pregnancy (increasing the risk for Vitamin D deficiency), and Mother had marked joint laxity. *Id.* at 211-13, 235, 248. Based on these risk factors, Dr. Miller concluded that "I think the most likely cause is these risk factors combined then led to the diagnosis of metabolic bone disease of infancy[,]" which can lead to "fractures with minimal forces." *Id.* at 213. Doctor Miller also testified that it was "[p]robably unlikely" that Children's injuries were the result of child abuse, *id.*, noting that if the injuries were the result of violent forces exerted on Children it is unusual that they evidenced no skin injuries. *Id.*

When asked about his "methodology" behind MBDI, Dr. Miller testified that his theory applies Dr. Harold Frost's Utah Paradigm, a scientific model that added bone loading to the equation of what determines bone strength. *Id.* at 224-26.  Moreover, Dr. Miller testified that in conducting his analyses, he uses a CT bone density machine, *id.* at 217, relies on the history of risk factors known to lead to a predisposition of weaker bones, conducts studies of children self-referred by parents or attorneys,[24] relies on mothers' representations of decreased fetal movement during pregnancy, and refers to peer-reviewed literature on fetal restriction that utilizes ultrasound technology and other technologies to measure bone density.  *Id.* at 222.  Specifically, with regard to this case, Dr. Miller testified that he looks at a "multifactorial[25] analysis to determine . . . bone strength."  *Id.* at 231.

In *Snizavich v. Rohm & Haas Co.*, 83 A.3d 191 (Pa. Super. 2013), our Court noted that

> [T]he minimal threshold that expert testimony must meet to qualify as an expert opinion rather than merely an opinion expressed by an expert, is this:  the proffered expert testimony **must point to, rely on or cite some scientific authority— whether facts, empirical studies, or the expert's own research**—that the expert has applied to the facts at hand and which supports the expert's ultimate conclusion.  **When an expert opinion fails to include such authority, the trial court**

---

[24] These children's parents were involved in litigation in either the criminal justice system or with a Children and Youth Agency.  *See* N.T. Dependency/Abuse Hearing, 9/23/20, at 269.

[25] Doctor Miller testified that the term "multifactorial" means "that both genes and environmental factors" play into the analysis underlying MBDI.  *Id.* at 306.

> **has no choice but to conclude that the expert opinion reflects nothing more than mere personal belief**.

*Id.* at 197 (emphasis added). ***See also Grady***, ***supra*** at 1045 ("proponent of expert scientific evidence bears the burden of establishing all of the elements for its admission under Pa.R.E. 702, which includes showing that the ***Frye*** rule is satisfied").

Instantly, the trial court found Dr. Miller's opinion was not commonly held by experts in his area of expertise and that his opinion "is deficient as a matter of law in that it does not express a level of certainty consistent with Pennsylvania Jurisprudence." Trial Court Opinion, 4/22/21, at 19. On direct examination, counsel pointed out that in other jurisdictions, Dr. Miller's theory of MBDI has been regarded as a "fringe" or "novel opinion," one that "remained unproven and generally unaccepted in the medical community," and one that had been "negatively peer reviewed in several publications." *Id.* at 20. Moreover, Dr. Miller admitted he is neither a pediatric radiologist nor did he have formal training in child abuse. *Id.* at 21.

The court specifically stated at the dependency/abuse hearing, "the Doctor's **opinions** are not commonly held by experts in the area of his expertise and[, therefore,] the ***Frye*** motion is granted." N.T. Dependency/Abuse Hearing, 1/27/21, at 124 (emphasis added). However, Pennsylvania cases adopting the ***Frye*** standard have clearly stated that the scientific community only needs to accept an expert's **principles or methodology** underlying his or her opinions or conclusions, and not the conclusions themselves. ***See Grady***, 839 A.3d at 1045 ("This does not mean,

however, that the proponent must prove that the scientific community has also generally accepted the expert's conclusion. We have never required and do not require such a showing."). **Accord: Walsh v. BASF Corp.**, 234 A.3d 446 (Pa. 2020); **Trach v. Fellin**, 817 A.2d 1102, 1114 (Pa. Super. 2003). **See also** Pa.R.E. 705 ("If an expert states an opinion the expert must state the facts or data on which the opinion is based."). As our Court acknowledged in **Nevels**, **supra**, whether there is a legitimate dispute regarding the reliability of an expert's **conclusions** bears on the determination of whether that expert's technology is "novel" scientific evidence, not upon the methodology underlying that evidence. **Nevels**, 203 A.3d at 239.

In its Rule 1925(a) opinion, the trial judge clarified his ruling on the inadmissibility of Dr. Miller's expert testimony, stating:

> Further, Dr. Miller's opinion is deficient as a matter of law in that it does not express a level of certainty consistent with Pennsylvania [j]urisprudence which requires that an [e]xpert must testify to a reasonable degree of medical certainty. "An expert fails this standard of certainty if he testifies 'that the alleged cause' 'possibly' or 'could have' led to the result, that it 'could very properly account' for the result, or even that it was 'very highly probable' that it caused the result." **Eaddy v. Hamary**, 694 A.2d 639, 642 (Pa. Super 1997) (citation omitted).
>
> Accordingly, as [P]arents did not meet their burden of showing that the medical community generally accepts the **scientific methodology** used by Dr. Miller in reaching his conclusion that MBDI caused these Children's injuries, this Court found Dr. Miller's opinion does not meet the admissibility standards governed by the Pennsylvania Rules of Evidence and **Frye** and[,] therefore[,] is excluded.

Trial Court Opinion, 4/22/21, at 30-31 (citation omitted) (emphasis added).

Thus, the court explained that with respect to **Frye**, it concluded that the

methodology used by Dr. Miller to reach his theory of MBDI was not generally accepted by the scientific community. Moreover, with regard to Dr. Miller's overall expert opinion as to the mechanism of Children's injuries, the court concluded it lacked the level of certainty legally required to be admissible. **See** Pa.R.E. 702 (Comment) ("Pa.R.E. 702 does not change the requirement that an expert's opinion must be expressed with reasonable certainty.").

We disagree with the court's conclusion that Dr. Miller did not express his opinion to a reasonable degree of medical certainty. In fact, Dr. Miller specifically testified "to a reasonable degree of medical certainty" that he believed Children's injuries were caused by MBDI. **See** N.T. Dependency/Abuse Hearing, 9/23/20, at 250-51 (Doctor Miller answering in the affirmative when asked on direct examination as to whether he was able to say "to a reasonable degree of medical certainty" that MBDI was the cause of Children's injuries).

However, we concur with the court's determination that Dr. Miller's testimony was nonetheless inadmissible based on the principles espoused in **Frye**— specifically, that Dr. Miller failed to prove that his methodology supporting MBDI was generally accepted in the medical community. **See** Trial Court Opinion, 4/22/21, at 19-31. In discussing the methodology behind Dr. Miller's medical opinion that MBDI caused Children's injuries, the court noted that Dr. Miller did not perform advanced bone testing on Children or assess their bone strength. The court also relied upon Dr. Bennett's expert testimony. **See In the Interest of M.R.**; **supra**; **Hopkins**; **supra**.

Specifically, Doctor Bennett testified that, to her knowledge, the term "metabolic bone disorder of infancy," used by Dr. Miller, is not a medical term commonly accepted by the vast majority of medical providers, including pediatric specialists or child abuse teams, and it has also not been recognized in any type of publication taught to doctors.[26]   N.T. Dependency/Abuse Hearing, 9/23/20, at 69-72.  The court also found convincing two statements, one made by the Society for Pediatric Radiology and one by the European Society of Pediatric Radiology, denouncing TBBD (a subset of MBDI) because it "lacks the appropriate grounding in scientific **methods** and procedures because it is based on the unsupported speculation and subjective beliefs of a small number of medical professionals."  Trial Court Opinion, 4/22/21, at 29 (emphasis added).

Here, Dr. Miller, as the proponent of a novel scientific theory, failed to meet his burden of proving that the methodology behind MBDI had general acceptance in the scientific community.  ***Grady***, ***supra****.*  Evidence was admitted showing that Dr. Miller's scientific theories (TBBD & MBDI) were

_____

[26] Although presumably going to the weight of Dr. Miller's opinion, Dr. Bennett also testified that contrary to much of Dr. Miller's testimony, Children were *not* born prematurely.  Moreover, notably Child's vitamin D level was normal, there was no evidence of rickets in Child's bones, and there was no evidence of bone mineralization on Children's x-rays.  Doctor Bennett also noted that Mother was taking pre-natal vitamins, including vitamin D, was receiving prenatal care, and fed Children formula that was most likely fortified with vitamin D.  Finally, the court noted that Dr. Bennett testified Children's birth records did not indicate any concerns about injuries or anything that occurred during the birth process.

discredited by other state courts, had been negatively peer-reviewed in several publications, and that other courts have found that the doctor's theories were based on "subjective interpretation regarding the existence of the factors, that in his opinion, genetically exist in metabolic bone disease." Trial Court Opinion, 4/22/21, at 21. Accordingly, we conclude that the trial court's decision to exclude Dr. Miller's expert testimony was not the result of manifest unreasonableness, partiality, prejudice, bias, or ill-will or that it lacked support so as to be clearly erroneous. *Grady*, *supra*; *Paden v. Maker Concrete Constr. Inc.*, 658 A.3d 341, 343 (Pa. 1995).

With regard to Mother's claim that the trial court impermissibly excluded Dr. Gootnick's expert testimony, report, and trial exhibits, we are aware of the well-established standard that "[t]he admission of expert testimony is a matter within the sound discretion of the trial court, whose rulings thereon will not be disturbed absent a manifest abuse of discretion." *Woodard v. Chatterjee*, 827 A.2d 433, 440 (Pa. Super. 2003) (quoting *Walsh v. Kubiak*, 661 A.2d 416, 419 (Pa. Super. 1995) (en banc)). To be deemed admissible, "expert testimony must be based on more than mere personal belief, and must be supported by reference to facts, testimony[,] or empirical data." *Snizavich*, 83 A.3d at 195 (citation omitted). Moreover, the fair scope rule provides that "an expert witness may not testify on direct examination concerning matters which are either inconsistent with or go beyond the fair scope of matters testified to in discovery proceedings or included in a separate

report." ***Woodard***, 827 A.3d at 441 (citations omitted); ***see also*** Pa.R.C.P. 4003.5(c).

> The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from making a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.

***Id.*** (quoting ***Feden v. CONRAIL***, 746 A.2d 1158, 1162 (Pa. Super. 2000)) (emphasis removed).

In excluding Dr. Gootnick's testimony, expert report, and trial exhibits, the court found that Dr. Gootnick's "testimony was tainted, . . . [and found] her [e]xhibits, both the [e]xpert [r]eport of 4/15/20, and the demonstrative evidence she presented during her testimony on 1/27/21, to be also tainted." Trial Court Opinion, 4/22/21, at 37. The court concluded that the taint: (1) "[wa]s such that [it] could not believe anything the doctor said[;]" (2) "tainted everything that she has offered an opinion on[;]" and (3) "corrupts the whole process[,] . . . the witness[,] . . . [and] everything the witness says." ***Id.*** at 37-38.

The court based its conclusion that the doctor's testimony, report, and exhibits were tainted from the fact that several statements in Dr. Gootnick's April 15, 2020 expert report were incorrect, including:

- an opinion that "the twin's bones were weakened at birth due to the prematurity and IUGR Intrauterine Grown Retardations, [and, thus, Child's] bones were more likely to break during Cesarean Section. [So y]ou're suggesting that the fracture of the femur occurred during the C[-]Section? No. I mentioned this to [my attorney] yesterday that **the**

**last sentence is incorrect**. And I[,] for some reason[,] **I have no idea where that came from but that is incorrect**. It is not a well-known side effect[] of birth, a C[-]Section. I would like to—that's something that should have been changed." N.T. [Dependency/Abuse Hearing,] 1/27/21, at 107 (emphasis added);

- a statement that " So in your initial report you do refer to a fracture of [La.- Ra.]'s left femur correct. **That's another one of those things that should not be in there**. . . . **I don't believe that's an insufficiency fracture**. . . . **Like I said when this report was modified** [**it was**] **not by myself**. . . . **I have no idea** [**who modified it**]."

- an opinion that "[a]rea in the sections do not cause blood fractures in general. And if they do, they cause them in the clavicles in the shoulders."

N.T. Dependency/Abuse Hearing, 1/27/21, at 107, 114-15, 118 (emphasis added). The following discourse took place between the Child Advocate and Dr. Gootnick, during cross-examination, about the alleged "added" information contained in her expert report:

Child Advocate: Doctor Gootnick, are you saying that your April 2020 report was changed by somebody other than yourself?

Dr. Gootnick: Yes.

Child Advocate: Do you have any idea who would have taken your report that was provided to all counsel and the [c]ourt in advance of this hearing and who would have changed that report?

Dr. Gootnick: I don't know. But [Mother's attorney] and I spoke about it yesterday and I mentioned that to him. I have no idea.

Child Advocate: You're certainly not suggesting [Mother's attorney] changed[,] it are you?

Dr. Gootnick: I have no idea who did it.

\* \* \*

Child Advocate: And you cannot offer any thoughts whatsoever on who would have taken your expert report with your signature on the bottom of it on Page 8 and would have made changes to that report?

* * *

Dr. Gootnick: I have no idea who wrote it.

N.T. Dependency/Abuse Hearing, 1/27/21, at 115-18.[27] At this point, the Child Advocate and DHS' attorney moved to strike all of Dr. Gootnick's testimony, including her expert report and demonstrative evidence. *Id.* at 119. In response to the oral motion, Mother's counsel stated that he "ha[s] no idea how those statements [in the expert report] came to be changed or

_____

[27] The trial judge also questioned Dr. Gootnick about the statements in the expert report that she did not make:

Court: [Your report w]as modified at what point in time?

Dr. Gootnick: I don't know.

Court: Was that your initial report the [one from] 4/15?

Dr. Gootnick: Absolutely. No question about it.

Court: You signed off on it?

Dr. Gootnick: I did.

Court: Then what modification are we talking about? I'm not getting the picture here.

Dr. Gootnick: Your Honor, I signed off on it before it was modified.

Court: It was modified after you signed off on it?

Dr. Gootnick: Correct.

*Id.* at 117.

[are now ]different than [those in Dr. Gootnick's] original opinion." *Id.* at 120. Mother's attorney argued that since Dr. Gootnick's opinion "has been clear [and h]er convictions have been stated to a reasonable degree of medical certainty on the two particular issues . . . regarding the left femur fracture as well as the right femur fracture and the status of the bone health at the time," that he was willing to stipulate to strike those portions of Dr. Gootnick's report that she now "disavows[,] . . . but d[id] n[o]t believe that . . . it's appropriate to strike all of her testimony and her report[.]" *Id.* Father's counsel also argued that the "added" statements in Dr. Gootnick's report are "separable from the report in general [and her demonstrative exhibit]" and that "her testimony ha[d] been clear and consistent and isn't anchored to the report in the sense that her testimony should be excluded." *Id.* at 121. Father's attorney found the issue to be one of weight of the evidence, not admissibility of the evidence. *Id.*

After the Child Advocate and DHS' attorney reminded the trial judge that Dr. Gootnick "spoke with counsel . . . regarding the inconsistencies in her report[, and where a]t no time was that disclosed to the court or any party in th[e] matter[,]" the court struck Dr. Gootnick's testimony "in totality[, including] the exhibits[,] her report of 4/15[/20,] and the document that was offered as demonstrative evidence." *Id.* at 123.

Here, under Rule 4003.5, Dr. Gootnick testified to matters that differed from those statements and opinions expressed in her expert report (albeit apparently not authored by her). Moreover, the trial court's confidence in Dr.

Gootnick's expert testimony was severely undermined by her admission that the report she signed as her own had, in fact, been altered by an unknown individual. Under such circumstances, we can appreciate that the trial judge was unable to sever the alleged additional information contained in her expert report from the remainder of her testimony. In the eyes of the fact finder, Dr. Gootnick's credibility was compromised and therefore, striking her testimony, in addition to her expert report and evidence, was not an abuse of discretion. **Woodard**, **supra**; **Walsh**, **supra**. **See also N.B.-A.**, **supra** at 668 ("As an appellate court, we are required to accept the findings of fact and credibility determinations of the trial court, if they are supported by the record; however, th[is] [C]ourt is not bound by the lower court's inferences or conclusions of law.").

Next, Mother and Father argue that the trial court erred when it determined that Children were dependent and found that it was "clearly necessary" for the Children to be removed from their care where Parents: were compliant with visits and medical appointments; acted appropriately with Children during visits; were well-bonded to Children; and, the "isolated" incidents of alleged abuse occurred one year prior to the court's dependency determination. Mother's Brief, at 2.

Our scope of review in child dependency cases "is limited in a fundamental manner by our inability to nullify the fact-finding of the [trial] court." **In re Read**, 693 A.2d 607, 610 (Pa. Super. 1997). We accord great weight to the hearing judge's findings of fact because the judge is in the best

position to observe and rule upon the credibility of the witnesses. *Id.* "Relying on this unique posture, we will not overrule the findings of the trial court if they are supported by competent evidence." *Id. See also In the Interest of X.P.*, *supra* at 1276 (well-settled standard of review in dependency cases "requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the [trial] court's inferences or conclusions of law").

The Juvenile Act defines a dependent child, in relevant part, as a child who:

> **is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals**. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302 (emphasis added). Proper parental care is defined as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *In Interest of Justin S.*, 543 A.2d 1192, 1200 (1988) (citation omitted). Moreover, "[a] finding of abuse[,]" based on clear and convincing evidence, "may support an adjudication of dependency." *In the Matter of C.R.S.*, 696 A.2d 840, 843 (Pa. Super. 1997).

Notably, a dependent child's "proper placement turns on what is in the child's best interest, **not on what the parent wants, or which goals the parent has achieved**." *See In re J.J.*, 69 A.3d 724, 732 (Pa. Super. 2013) (emphasis added) (citations omitted). A child may be removed from a parent's care only upon a showing of clear necessity; clear necessity exits where "the continuation of the child in his home would be contrary to the welfare, safety, or health of the child and reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal[.]" *See* 42 Pa.C.S. §§ 6301, 6351(b).

Here, the trial court adjudicated Children dependent and committed them to DHS' custody based upon Children's young age and vulnerability and the severity of the injuries Children sustained while in Parents' sole care. The court found that it was clearly necessary to place Children in DHS' care, where their safety could not be assured if they were returned to Parents after Children had suffered unexplained bodily injuries in the form of multiple bone fractures and a subdural hematoma. Despite the fact that Parents attended visits with Children, were bonded to them, and complied with their case plan objectives, the fact remains that the trial judge concluded that placement outside of the family home was in Children's best interests and adjudicated them dependent. *In re J.J.*, *supra*. The court's findings are supported by

competent evidence. *In re Read*, *supra*. Thus, we find no abuse of discretion.[28] *J.R.W.*, *supra*.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/22/2021

---

[28] Notably, the trial court emphasized that despite the finding of abuse with regard to Parents, "the goal is still a reunification." N.T. Dependency/Abuse Hearing, 1/27/21, at 211.