J-A28019-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.B., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 585 MDA 2021 |

Appeal from the Order Entered March 25, 2021
In the Court of Common Pleas of Lackawanna County Juvenile Division at
No(s):  CP-35-DP-0000025-2021

BEFORE: LAZARUS, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED:  DECEMBER 20, 2021**

M.B. (Father) appeals from the order finding M.B.2 (Child)[1] dependent. Father challenges the trial court's determination that Child was a victim of child abuse and that Father was a perpetrator of that abuse.  We affirm based on the trial court's opinion.

We adopt the trial court's presentation of the facts.  Trial Ct. Op., 7/26/21, at 2-9.  Briefly, Father, K.M. (Mother), and Child were living in a motel room when Child overdosed on opioids and became unresponsive.  ***See id.*** at 3-4.  Mother called 911, the police arrived, and Child was taken to the hospital, which successfully treated Child with Narcan.  ***See id.*** at 4-5.  On

---

[*] Former Justice specially assigned to the Superior Court.

[1] The trial court appointed Kevin O'Hara, Esq., as Child's guardian *ad litem*.

J-A28019-21

February 19, 2021, the Lackawanna County Office of Youth and Family Services (Agency) filed a dependency petition. On March 25, 2021, the court held an evidentiary hearing. Following the hearing, the court adjudicated Child dependent, found there was child abuse, and that Father was a perpetrator of abuse. Order, 3/25/21; N.T. Hr'g, 3/25/21, at 220-21.[2] On Monday, April 26, 2021, Father timely appealed and filed a Pa.R.A.P. 1925(a)(2) statement.

Father raises the following issues on appeal:

1. Whether the trial court erred as a matter of law and/or manifestly abused its discretion in determining [Child] was the victim of "child abuse" as that term is defined at 23 Pa.C.S.[] § 6303?

2. Whether the trial court erred as a matter of law and/or manifestly abused its discretion in determining Father was a perpetrator of child abuse against . . . Child?

Father's Brief at 5.

In support of his first issue, Father argues that the Agency failed to present clear and convincing evidence that he intentionally, knowingly, or recklessly caused Child's injuries or created a risk of such injuries. *Id.* at 10. Father emphasizes that the finding of child abuse was based solely on Dr. Barbara Chaiyachati's testimony that Child suffered from polysubstance

_____

[2] The trial court also found that Mother was a perpetrator of child abuse. However, Mother did not appeal. We acknowledge that Child was in the care of both parents at the time in question.

- 2 -

exposure. *Id.* at 10-11. In Father's view, Dr. Chaiyachati could not exclude the motel room where the family was staying as the source of the polysubstance exposure. *Id.* at 12. In support, Father notes that the police did not search the motel room for the substances at issue and that he told the police he regretted not cleaning the motel room appropriately. *Id.* at 12-13. Because the motel room could have been the source of Child's polysubstance exposure, Father concludes that the Agency failed to prove child abuse. *Id.* at 13-14.

Our standard of review follows:

> In reviewing an order in a dependency matter, our standard of review requires us to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re Interest of N.B.*, 260 A.3d 236, 245 (Pa. Super. 2021) (citation omitted and formatting altered); *accord In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (holding *en banc* Superior Court erred by vacating the trial court's order finding that the parent committed child abuse).

Section 6303(b.1) of the Child Protective Services Law (CPSL) defines "child abuse" as "intentionally, knowingly or recklessly . . . [c]ausing bodily injury to a child through any recent act or failure to act" or "[c]reating a reasonable likelihood of bodily injury to a child through any recent act or failure to act." 23 Pa.C.S. § 6303(b.1)(1), (5). "Bodily injury" is defined as "[i]mpairment of physical condition or substantial pain." *Id.* § 6303(a).

- 3 -

Section 6304(a) excludes environmental factors from the definition of child abuse:

> **(a) Environmental factors.—**No child shall be deemed to be physically or mentally abused based on injuries that result solely from environmental factors, such as inadequate housing, furnishings, income, clothing and medical care, that are beyond the control of the parent or person responsible for the child's welfare with whom the child resides.

*Id.* § 6304(a).

Recently, in *In re C.B.*, --- A.3d ---, 2021 PA Super 189, 2021 WL 4314628 (Pa. Super. filed Sept. 23, 2021) (*en banc*), this *en banc* Court summarized the applicable law for a finding of child abuse:

> The requisite standard of proof for a finding of child abuse pursuant to section 6303(b.1) of the CPSL is clear and convincing evidence. A petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations. Clear and convincing evidence is evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

*C.B.*, 2021 WL 4314628 at *5 (citations omitted and formatting altered).

In *Interest of La.-Ra. W.*, --- A.3d ---, 2021 PA Super 227, 2021 WL 5443285 (Pa. Super. filed Nov. 22, 2021), this Court addressed the parents' challenge to (1) the sufficiency of evidence of the trial court's determination that their children were victims of child abuse; and (2) the trial court's holding that they were the abusers. *La.-Ra. W.*, 2021 WL 5443285 at *1, 4-5. In that case, the children had unexplained bone fractures and a subdural hematoma, and the treating doctors had ruled out various causes including

self-inflicted injury and genetic conditions. *Id.* at *1-2. The doctors testified that the "injuries were non-accidental trauma, indicative of child abuse." *Id.* at *2. The *La.-Ra. W.* Court, after summarizing the medical testimony, agreed with the trial court that clear and convincing evidence existed that the children, who suffered unexplained injuries while in their parents' care, were victims of child abuse. *Id.* at *6.

In the instant case, after careful review of the parties' arguments, the record, and the trial court's opinion, we agree with the trial court that clear and convincing evidence exists that Child was the victim of child abuse. *See* Trial Ct. Op. at 10-12 (summarizing the record evidence). Similar to the children's injuries in *La.-Ra. W.*, Child's injury occurred while in his parents' care and they were the only caretakers. *Compare id.*, *with La.-Ra. W.*, 2021 WL 5443285 at *6. Although Father argued that Child's injuries were the result of environmental contamination, *i.e.*, an unclean motel room, the record supports the trial court's holding that clear and convincing evidence of Child's abuse existed. *See* Trial Ct. Op. at 10-12; *C.B.*, 2021 WL 4314628 at *5. For these reasons, Father did not establish the trial court abused its discretion. *See N.B.*, 260 A.3d at 245.

Lastly, Father argues that the trial court erred by concluding that he was a perpetrator of the child abuse. Father's Brief at 14. Father discusses evidence that he argues exclude him as the source of Child's drug exposure. *Id.* at 15. Father notes that the drugs found in Child's blood were identical to

the drugs found in Mother's drug test, which was conducted a month earlier.

***Id.***

In determining whether a parent is a perpetrator of child abuse, the ***C.B.***

Court summarized the applicable law:

> As part of a dependency adjudication, a court may find a parent or caregiver to be the perpetrator of child abuse as defined by the CPSL. Section 6381 of the CPSL, which governs evidence in court proceedings, states that in addition to the rules of evidence relating to juvenile matters, the rules of evidence in this section shall govern in child abuse proceedings in court. Specifically, section 6381(d) provides for an attenuated standard of evidence in making a legal determination as to the abuser in child abuse cases where a child has suffered serious physical injury as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child.
>
> \* \* \*
>
> Section 6381(d) of the CPSL . . . establishes a rebuttable, evidentiary presumption when a child sustains abuse not ordinarily suffered absent acts or omissions of a parent or other responsible party. Under such circumstances, the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible.
>
> To aid the Juvenile Court in determining whether a child has been abused, the Legislature deemed it wise and necessary to establish a different evidentiary standard for finding child abuse by a parent or person responsible for the child's care, one in contrast to the overall standard for determining dependency under the Act.
>
> This lessened standard of establishing abuse by the caretakers under section 6381(d), coupled with the clear and convincing evidence necessary to find dependency, has been imposed by the Legislature as the standard which the Juvenile Court must apply in deciding abuse cases. *Prima facie* evidence is not the standard that establishes the child has been abused, which must be established by clear and convincing evidence; it is the standard

by which the court determines whom the abuser would be in a given case. . . .

\* \* \*

Under section 6381(d), a parent or other responsible caregiver may rebut the *prima facie* presumption with evidence:

> demonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by [the Agency] and the rebuttal of the parent or responsible person.

A parent does not actually have to be physically present with the child at the time of the abuse for the presumption to apply to that parent.

\* \* \*

Under section 6381 of the CPSL, a petitioning party is not required to establish that the parent or caregiver perpetrated the abuse intentionally, knowingly or recklessly. Rather, in section 6381 cases, the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible, permitting petitioners to prove their case with only the physical evidence of injuries that would not ordinarily be sustained but for the action or inaction of the parents or responsible persons and the implausible statements of the parents and responsible persons.

*C.B.*, 2021 WL 4314628 at \*5-7 (citations and footnotes omitted and formatting altered).

Instantly, upon review of the parties' arguments, the record, and the trial court's reasoning, we affirm on the basis of the trial court's decision. *See* Trial Ct. Op. at 12-15. Father appears to argue that he was not the source of

the drugs found in Child and the trial court erred by finding that he was a perpetrator. *See* Father's Brief at 14-15. As the trial court reasoned, Father's argument overlooks that it was his burden to rebut the *prima facie* evidence of abuse and Father failed to present any such evidence. *See* Trial Ct. Op. at 15; 23 Pa.C.S. § 6381(d); *C.B.*, 2021 WL 4314628 at *5 (stating, "the fact of abuse suffices to establish *prima facie* evidence of abuse by the parent or person responsible" (citation omitted)). We add that to the extent Father apparently faults Mother as the source of the drugs, Father overlooks that his "failure to act" could still cause bodily injury or create a reasonable likelihood of bodily injury to Child. *See* 23 Pa.C.S. § 6303(b.1)(1), (5). Because we agree with the trial court that Father failed to rebut the *prima facie* evidence of abuse, we discern no abuse of discretion, and we affirm the trial court's order. *See N.B.*, 260 A.3d at 245.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/20/2021

- 8 -

IN RE:                                    :        IN THE COURT OF COMMON PLEAS
                                          :        OF LACKAWANNA COUNTY
        M.B.                              :
                                          :        JUVENILE DIVISION
                                          :        NO.: CP-35-DP-25-2021

## OPINION PURSUANT TO PA.R.A.P. 1925

JARBOLA, J.

## I.        INTRODUCTION

The Lackawanna County Office of Youth and Family Services (hereinafter "Agency")

petitioned for dependency of the above-indicated minor child, M.B. (D.O.B. 1/7/21) on February

19, 2021.  A hearing on the Agency's petition was held on March 25, 2021.  During said hearing,

the Agency sought a finding of abuse on behalf of the minor child.  K█████ M███ (hereinafter

"Mother") and M████ B██████ (hereinafter "Father") were represented by separate,

appointed counsel.   Having weighed and considered the relevant evidence submitted, this Court

entered an Order, and corresponding Findings of Fact, finding the minor child to be a victim of

abuse and Mother and Father to be perpetrators of said abuse.  On May 13, 2021, Father filed his

timely Notice of Appeal and Concise Statement of Errors/Matters Complained of, raising the

following grounds:

a. **Whether the Trial Court erred as a matter of law and/or manifestly abused its**
   **discretion in determining the minor child was the victim of "child abuse" as that**
   **term is defined at 23 Pa.C.S.A. § 6303;**

b. **Whether the Trial Court erred as a matter of law and/or manifestly abused its**
   **discretion in determining the biological father was a perpetrator of child abuse**
   **against the minor child.**

1

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On or about February 15, 2021, the Agency sought an Emergency Protective Order, alleging that minor child, M.B. (D.O.B. 1/7/21) was taken to the Emergency Room in Bucks County, Pennsylvania, on February 13, 2021 and tested positive for opiates and amphetamines. (*See generally* Application for Emergency Protective Custody, filed 2/15/21); (*see generally* Confirmation of Verbal Order for Emergency Protective Custody, filed 2/15/21). The Child coded, was medically revived, and ultimately admitted to Children's Hospital of Philadelphia, where he screened positive for opioids and other substances including Methamphetamine, Amphetamine, Fentanyl, Norfentanyl, Morphine and the Narcan. (*See generally* Shelter Care Application, filed 2/16/21). A Shelter Care Hearing was held on February 16, 2021 and the minor child was adjudicated dependent on March 25, 2021. (*See generally* Shelter Care Order, filed 2/16/21); (*see generally* Dependency Petition, filed 2/19/21). At the Adjudication Hearing, the Agency sought a finding of child abuse, as well as a finding that Mother and Father were the perpetrators of said abuse. (*See generally* Order of Adjudication and Disposition, filed 3/25/21).

This family's history with the Agency began in 2020, after the Agency received a referral for "Mother's potential substance abuse while pregnant." (N.T., 3/25/2021, p. 177). An additional referral came in at the time of the minor child's birth as Mother screened positive for Amphetamine and Methadone and admitted to using Heroin. Id. at 177-178. At his birth on August 7, 2021, the minor child was diagnosed with Neonatal Abstinence Syndrome (NAS) – defined as a presence of withdrawal symptoms. Id. at 94. His discharge summary, eighteen days after his birth, showed that the minor child's cord blood was positive at birth for Amphetamine, Methamphetamine, and Methadone; his urine was also positive for Methadone. Id. at 97.

2

Roughly one month later, on February 13, 2021, the minor child was rushed by ambulance to St. Mary's Hospital in Langhorne, Pennsylvania, for low heart and respiratory rates. Id. at 20; 30-31. The child coded, was revived using Narcan, and was later transferred to Children's Hospital of Philadelphia (CHOP) where he was diagnosed with Polysubstance Exposure. Id. at 20, 37. At that time, urinalysis confirmed the presence of opioids and other substances in the minor child's system including Methamphetamine, Amphetamine, Fentanyl, Norfentanyl, Morphine and the Narcan. Id. at 26; 32. The Doctors at CHOP made an ultimate determination of child abuse and neglect. Id. at 21-22, 26. This Court agrees with the determination of child abuse for the reasons that follow:

On February 13, 2021, the Bensalem Township Police Department received a 9-1-1 call at 11:40 a.m. for an infant in distress at the Knights Inn, Room 211, Bensalem Township, PA. Id. at 124-126. Detective Aaron Woelkers of the Bensalem Police Department testified that the first responding officer[1] arrived on the scene at 11:41 a.m. Id. A review of the hotel's video footage showed that the first responding officer knocked on the door to Room 211 three times and waited 18 seconds before the door was opened. Id. at 127. Once inside the hotel room, police observed Mother holding the minor child; Mother indicated that she woke up around 7:00 a.m. to feed the minor child and then went back to bed. Id. at 128. She told the police that she later woke up and noticed the child attempting to cry but there was no sound coming out; she also stated that when she picked the child up his skin was changing color. Id. She then had Father attempt rescue breaths on the child but ultimately called 9-1-1. Id. Detective Woelkers went on to detail that an ambulance arrived at the hotel at 11:44 a.m. and departed at 11:54 a.m.

---

[1] Detective Woelkers testified that Officer Schwarting of the Bensalem Police Department was the first officer on the scene. (N.T. 3/25/2021, p. 126).

3

— a total of ten minutes later. Id. at 144. Mother went with the child in the ambulance and Father stayed behind to pack up the room, departing at 1:08 p.m. Id.

A further review of the hotel's video footage showed that the parents and the minor child checked in at 6:40 p.m. on February 12, 2021, Father left for approximately a half hour at 10:40 p.m. and returned with a pizza. Id. at 132-133. Nobody else entered or exited the room except for Mother taking an occasional smoke break. Id. at 133. On cross-examination, Detective Woelkers testified that police respond to the Knights Inn frequently for criminal activity, including drug activity and overdoses. Id. at 138-139.

Ultimately, the minor child was admitted to Children's Hospital of Philadelphia (hereinafter "CHOP") on February 13, 2021, following an initial intake at St. Mary's Hospital in Langhorne, Pennsylvania. Id. at 20. After qualifying as an expert witness in child abuse pediatrics, Dr. Barbara Chaiyachati (hereinafter "Doctor"), a member of the child's medical team at CHOP, testified that the minor child presented at his initial intake with low heart and respiratory rates so he was administered Narcan, after which his respiratory rate improved.[2] Id. at 30-31. Doctor Chaiyachati explained that the child's response to the Narcan administered at St. Mary's Hospital suggested that the drug worked as intended in reversing an opioid intoxication. Id.

The Doctor went on to discuss that when the minor child was transferred to CHOP, he was examined by the hospital's "SCAN" team, which the Doctor defined as a child protection team comprised of attending board certified or board eligible physicians in child abuse pediatrics, as well as other physicians. Id. at 21-22. The SCAN team reviewed the child's medical records from his initial hospitalization and birth as well as had a discussion with his

---

[2] The Doctor testified that the child's respiratory rate was initially 16 but improved to 38 after Narcan was administered. (N.T. 3/25/2021, pp. 30-31).

4

primary care physician in order to make an ultimate diagnosis of child abuse and neglect. Id. at 21-22, 26. Ultimately, the minor child was admitted to the Pediatric Intensive Care Unit and underwent lab testing on his urine that documented the presence of opioids and other substances in his system including Methamphetamine, Amphetamine, Fentanyl, Norfentanyl, Morphine and the Narcan. Id. at 26; 32. A head CT was also ordered on the child to rule out any brain injuries. Id. at 37, 49. The Doctor stated that a review of the history and the lab work provided a diagnosis of polysubstance exposure. Id.

In formulating a diagnosis, Doctor Chaiyachati spoke with the minor child's attending physician at St. Mary's Hospital. Id. at 4. He relayed that he spoke with Mother and Father when the child was first admitted and they indicated that the child stopped breathing on two occasions – the first time, the parents responded by rubbing the child's back and the second time, they called 9-1-1. Id. The parents did not report any sort of fever or other change to warrant the child's emergency state. Id. He went on to explain that the child's breathing and heart rate again began to fall when he was in the emergency room at St. Mary's Hospital, so the physicians used an Ambu bag to support his breathing. Id. at 41-42. All involved physicians believed that the child's condition at that point was life-threatening. Id. at 43. There was one additional instance where the child's heart rate fell so low that the physicians at St. Mary's had to perform chest compressions (CPR) to keep him alive.[3] Id.

Once the minor child was admitted to CHOP, the SCAN team spoke directly to Mother via telephone regarding the minor child's history. Id. at 43-44. Mother indicated that she and Father were and are the only caretakers of the child. Id. at 45. Mother explained that she does not work outside of the home and Father is on disability at home due to a liver transplant. Id. at

---

[3] There is an allegation listed in the Saint Mary's Hospital records that Father was overheard commenting that he didn't want the minor child to be drug tested. (N.T. 3/25/2021, p. 210).

118-119. Mother also denied anyone else living in the familial home and stated that the only medications that she and Father were on at the time of the child's emergency incident were Synthroid (a thyroid medication) and anti-rejection medications, neither of which were in their possession at the time of the February 13, 2021 incident. Id. at 46, 118-119. Mother also told the SCAN team that she never breastfed the child and denied that the minor child was on or exposed to any medications on February 13, 2021. Id. at 46-47. Mother explained that on the morning of February 13, 2021, the child drank a bottle at 7:00 a.m., woke up around 11:00 a.m., was turning colors and had stopped breathing so she and Father called 9-1-1. Id.

The Doctor went on to testify that there was no plausible explanation as to where the minor child's polysubstance exposure could have come from – there was no applicable medical history and no current presence of substances. Id. at 50. She did note that the child was born with some sort of Morphine addiction, detailing that the discharge summary from the child's birth showed that his cord blood was positive for amphetamine, methamphetamine, and Methadone; his urine was also positive for Methadone. Id. at 97. She explained, however, that at the time the child was admitted to the hospital on February 13, 2021, there would not have been any residual effects in the child's system from birth such that would warrant the life-saving measures performed on him.[4] Id. at 50-53. Additionally, there was no presence of Fentanyl in the blood at birth, but the same substance was present when the minor child was admitted to CHOP on February 13, 2021. Id. at 108. Ultimately, the Doctor stated that "given [the minor child's] age and developmental capabilities, at the time of presentation, he was unable to administer substances or expose himself to substances and given that he is completely reliant on the care of others, it indicated an associated diagnosis of child abuse by Polysubstance Exposure

---

[4] The child was born with Neonatal Abstinence Syndrome (NAS) – the presence of withdrawal symptoms – and his last dose of morphine was administered orally on January 20, 2021. (N.T. 3/25/2021, p. 94).

6

and that is the information in which the diagnosis was made." Id. at 53, 78. Doctor Chaiyachati did mention that, over the minor child's stay at CHOP, his levels regarding the polysubstance exposure did go down. Id. at 102-105.

Additional concerns were raised at CHOP regarding the minor child's weight. Id. The child was born in the 13th percentile but, at the time he presented to CHOP, he had fallen into the point five (.05) percentile and appeared to not be gaining weight as he should. Id. The minor child also presented with a hernia approximately a week prior to the events that led to the February 13, 2021 hospital stay[5], although the Doctor did not believe that a hernia would attribute to his weight issues. Id. at 63, 77. Doctor Chaiyachati testified that, regarding the minor child's weight, that it could be indicative of neglect but required further evaluation. Id. at 53-54.

On February 15, 2021, Detective Woelkers was notified that the minor child had been diagnosed with Polysubstance Exposure and Bucks County opened a criminal investigation. Id. at 129-130. Detective Woelkers followed up with Mother and Father who indicated that they were in the Bensalem area on February 12, 2021 looking for a hospital as the minor child had an ear condition. Id. at 128-129. When Detective Woelkers brought up the child's diagnosis of Polysubstance Exposure, Father stated that it was his fault, and he should have cleaned the hotel room better. Id. at 130-131. Father did not specify what exactly was in the hotel room, but Detective Woelkers notified him that the substances found in the child's system may have been introduced in a different way than Father had indicated, at which point Mother and Father stated

---

[5] On February 3, 2021, Mother and Father took the minor child to Geisinger regarding a hernia; they then took the minor child to Wyoming Valley Emergency Room on February 4, 2021 regarding the same issue. (N.T. 3/25/2021, pp. 195-196). The Emergency Room doctors recommended an ultrasound be performed on the minor child but a note to the medical file indicated that Mother and Father had "other things to do and wanted to leave the hospital," so the family did not have the ultrasound performed. Id. at 196.

7

they wanted to talk to an attorney. Id. at 131. There was never any indication from the hotel staff that any illegal substances were found in the room. Id. at 137. Additionally, the room was not searched, nor was any testing performed on the air, carpet, or bedding. Id. at 136, 138.

Abigail Sanders, a Caseworker with Lackawanna County office of Youth and Family Services, testified that, currently, the minor child is placed in a traditional foster home with Michelle Burdenwood and Coran Wood in Wilkes-Barre, PA and is thriving.[6] Id. at 174-176. Caseworker Sanders explained to the Court that her involvement with the family began on February 3, 2021. Id. at 177. Prior to Caseworker Sanders involvement, the Agency responded to referrals in January 2021 regarding Mother's drug use while pregnant as well as the minor child's withdrawal at birth and set up a Safety Plan. Id. at 178-179. Following Mother and minor child's discharge from the hospital, Caseworker Kristin Meyers met the family at their home and requested that Mother provide a drug screen, which was ultimately positive for Methamphetamine. Id at 180. When she provided said screen, Caseworker Meyers noticed a plastic medicine bottle with a rubber lid in the toilet and asked Mother to provide a second sample. Id. Caseworker Meyers sent out the second sample and it returned a positive result of Fentanyl, Norfentanyl, Codeine, Morphine, Methamphetamine, Amphetamine, Xanax (which Mother had a prescription for) and Methadone. Id. at 181. Later in the month, on January 29, 2021, Mother screened positive only for Benzodiazepines (Xanax and Suboxone). Id. at 182.

Caseworker Sanders initially made contact with Mother and Father on February 3, 2021, at which time Mother spoke to her regarding feeding concerns she had for the child. Id. at 183. Following that contact on February 3, 2021, Caseworker Sanders was unable to reach Mother and Father until February 16, 2021 – after the February 13, 2021 emergency incident. Id. at 185.

---

[6] Following his discharge from CHOP, the minor child has been gaining weight consistently and was switched to a new formula. (N.T. 3/25/2021, p. 192, 208)

8

At that time, both Mother and Father indicated that they were unwilling to answer any questions without their attorneys. Id. Mother also refused to provide Caseworker Sanders with a drug screen. Id. at 186. Moving forward, Caseworker Sanders tried to reach out, but Mother and Father continued to refuse to answer questions regarding the February 13, 2021 incident. Id. at 186. Caseworker Sanders additionally attempted to meet with them on six separate occasions – all of which they did not show up for. Id. at 187-189. Further and perhaps most notably, neither parent has shown up for any of their scheduled visitation with the minor child since his placement and has not provided the Agency with any of the requested signatures regarding medical records, etc. Id. at 190-191. Caseworker Sanders stated that she is concerned the child has not started Early Intervention because Mother and Father will not sign the required paperwork. Id. at 196. Mother and Father did not testify at the March 25, 2021 hearing. *See generally* (N.T., 3/25/2021, p. 177).

At the conclusion of the hearing, the appointed Guardian ad Litem stated that, although he did not have a position on the Court's determination of child abuse, he found the behavior of the parents "very alarming." Id. at 220. The Court ultimately found that the Agency had met its burden by proof of clear and convincing evidence for an indication of a child abuse finding. Id. at 220-221. In rendering its decision, the Court stated "[t]he parents were the only caretakers of the child for an extended period of time, before this episode came upon the child. The doctor testified that it was an Acute Exposure to Polysubstance Intoxication, which occurred . . . close in time. She found it to be highly unlikely that it could've been residual. . . ." Id. at 221-222.[7]

---

[7] Michael Sulet, an intake caseworker from Bucks County Children and Youth Services, was additionally called as a witness; however, this Court indicated that it would not be basing any of its findings or its ruling on Caseworker Sulet's testimony. (N.T. 3/25/2021, p. 170).

## III.   DISCUSSION

### a.   Whether the Trial Court erred as a matter of law and/or manifestly abused its discretion in determining the minor child was the victim of "child abuse" as that term is defined at 23 Pa.C.S.A. § 6303?

Appellant's first contention is that this Court erred and/or abused its discretion in determining that the minor child was the victim of "child abuse" as defined by 23 Pa. C.S.A. §6303. 23 Pa. C.S.A. §6303(b.1) defines "child abuse" as intentionally, knowingly or recklessly doing any of the following:

>  (1) Causing bodily injury to a child through any recent act or failure to act.
>
>  . . . .
>
>  (5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.
>
>  . . . .

"Bodily injury" is defined as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S. § 6303(a).

For a finding of child abuse pursuant to 23 Pa. C.S.A. §6303(b.1), the standard of proof is clear and convincing evidence. *In the Interest of A.C., a Minor*, 237 A3d 553, 558 (Pa. Super. 2020). Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." Id. (quoting *G.V. v. Department of Public Welfare*, 91 A3d 667, 672 (Pa. 2014)).

In the instant matter, Dr. Barbara Chaiyachati, a medical expert in the field of Child Abuse Pediatrics and a lead member of the minor child's medical team at Children's' Hospital of Philadelphia (CHOP), testified that the minor child initially presented with low heart and

10

respiratory rates on February 13, 2021. (N.T. 3/25/2021, p. 30-31). The child coded and was successfully revived using Narcan. Id. at 20, 37. Ultimately, after extensive testing, the minor child was admitted to the Pediatric Intensive Care Unit and diagnosed with Polysubstance Exposure. Id. at 37, 49. At that time, opioids and other substances including Methamphetamine, Amphetamine, Fentanyl, Norfentanyl, Morphine and Narcan were found in the minor child's system. Id. at 26; 32.

Doctor Chaiyachati went on to testify that there was no plausible explanation as to where the minor child's polysubstance exposure could have come from – there was no applicable medical history and no current presence of substances. Id. at 50. The Doctor added that although the child was born with a Morphine addiction, as Appellant's counsel touched on, there would not have been any residual effects in the child's system from birth such that would present as an acute intoxication and warrant the life-saving measures performed on him on February 13, 2021. Id. at 50-53. Ultimately, the Doctor stated that "given [the minor child's] age and developmental capabilities, at the time of presentation, he was unable to administer substances or expose himself to substances and given that he is completely reliant on the care of others, it indicated an associated diagnosis of child abuse by Polysubstance Exposure. . .." Id. at 53, 78.

Further, Detective Aaron Woelkers of the Bensalem Police Department, a member of the department that responded to Mother and Father's 9-1-1 call on February 13, 2021, also testified that a review of the hotel's video footage showed that the parents and the minor child were the only individuals in the hotel room on February 12, 2021 - the night before the February 13, 2021 emergency occurred. Id. at 132-133. Nobody else entered or exited the room except for Mother taking an occasional smoke break and Father leaving for approximately a half hour to pick up a pizza. Id.

11

In this matter, both the medical expert and the investigating detective presented evidence that Mother and Father were the minor child's only caretakers, that they were the only individuals alone with the minor child on February 12, 2021 and February 13, 2021, and that the minor child's age and developmental capabilities rendered him unable to administer the substances found in his system himself. Id. at 45, 53, 78, 130-133. The Court elaborated on this, reiterating that ". . . the doctor testified that it was an Acute Exposure to Polysubstance Intoxication, which occurred . . . close in time . . . [and it was] highly unlikely that it could've been residual." Id. at 221-222. Additionally, Mother and Father did not present any evidence to rebut Dr. Chaiyachati and Detective Woelkers' testimony. (*See generally* N.T. 3/25/21).

This Court found that the evidence presented by the Agency was clear and convincing, as required by the standard, to prove that there was no plausible explanation for the child's impairment on February 13, 2021 other than child abuse. The actions or inactions in Room 211 of the Bensalem Knights Inn either intentionally, knowingly or recklessly caused the minor child's bodily injury or created a reasonable likelihood of the same – there is no other plausible explanation. Thus, the Court's ruling in determining that the minor child was the victim of "child abuse" as defined by 23 Pa. C.S.A. §6303 should be affirmed.

**b. Whether the Trial Court erred as a matter of law and/or manifestly abused its discretion in determining the biological father was a perpetrator of child abuse against the minor child.?**

Appellant's second claim is that this Court erred and/or abused its discretion in determining the biological Father was a perpetrator of child abuse. 23 Pa. C.S.A. §6381(d) states that [e]vidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person

responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

The Courts have "long recognized" the importance of the evidentiary standard set out in 23 Pa. C.S.A. §6381(d). *In the Interest of A.C., a Minor*, 237 A3d 553, 558 (Pa. Super. 2020). In A.C., the Court detailed that "*[p]rima facie* evidence . . . is the standard by which the court determines whom the abuser would be in a given case. . .. The Legislature has determined that the likelihood clearly established abuse has occurred, other than at the hands of the custodian, is so small that *prima facie* evidence the custodian has caused the injury, either by acts or omissions, is all that is required...." Id. at 558-559.

*Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." Black's Law Dictionary 825 (6th ed. Abridged 1991). Accordingly, the Courts have held that "evidence that a child suffered injury that would not ordinarily be sustained but by the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption." Id. at 559 (quoting *In re L.Z.*, 111 A.3d 1164, 1185 (PA. 2015)).

In the instant matter, Dr. Barbara Chaiyachati from CHOP testified that the child's medical team spoke to Mother regarding the minor child's medical history and Mother indicated that she and Father were and are the only caretakers of the child. Id. at 45. Mother also denied anyone else living in the familial home and stated that the only medications that she and Father were on at the time of the child's emergency incident were Synthroid (a thyroid medication) and anti-rejection medications, neither of which were in their possession at the time of the February

13

13, 2021 incident. Id. at 46, 118-119. Mother additionally told the SCAN team that she never breastfed the child and denied that the minor child was on or exposed to any medications on February 13, 2021. Id. at 46-47.

Again, Doctor Chaiyachati also testified that there was no plausible explanation as to where the minor child's polysubstance exposure could have come from as the minor child had no relevant medical history and the substances present in his system could not have been residual from a prior exposure. Id. at 50-53. As the minor child was roughly a month and a half old, he was completely reliant on the care of Mother and Father, the Appellant herein. Id. at 53, 78.

As previously discussed, a review of the hotel's video footage showed Mother, Father and the minor child were the only individuals in the hotel room from February 12, 2021 up until the time the police arrived on February 13, 2021. Id. at 132-133. Again, nobody else entered or exited the room except for Mother taking an occasional smoke break and Father leaving for approximately a half hour to pick up a pizza. Id. Further, when the first responding officer knocked on parents' hotel room door on February 13, 2021, he had to knock three times and waited 18 seconds before parents opened the door. Id. at 127. When the police ultimately discussed the minor child's diagnosis of Polysubstance Exposure with Mother and Father, Father stated that it was his fault, and he should have cleaned the hotel room better. Id. at 130-131. Father did not elaborate on that statement. Id. Additionally, Father did not testify at the hearing before this Court. (See generally N.T. 3/25/21).

In this matter, the Agency presented evidence that Mother and Father were the minor child's only caretakers and that they were the only individuals alone with the minor child at the Bensalem Knights Inn prior to the February 13, 2021 9-1-1 call. Id. at 45, 53, 78, 130-133. As that is the case, the minor child's injuries/impairment here would not have ordinarily been

14

sustained but by the acts or omissions of the parent(s). Based on the testimony, there is no other plausible explanation for how the substances came to be in the minor child's system. (*See generally* N.T. 3/25/21). Regarding the Appellant specifically, it is clear to this Court that Father either actively contributed to the child's injuries/impairment or failed to act in preventing the same. Further, Father did not present any credible testimony to rebut that presumption. Id. Thus, for the reasons set forth above and in consideration of all competent evidence of record, this Court properly determined that Appellant is a perpetrator of abuse against the minor child.

## I. CONCLUSION

Based upon the competent evidence presented at the time of the March 25, 2021 hearing, including but not limited to a review of the transcript, the Court's file and Father's inability to effectively rebut this Court's findings, this Court finds that it properly determined the minor child was the victim of "child abuse" as defined at 23 Pa.C.S.A. § 6303 and that Father/Appellant was a perpetrator of abuse. As such, for the foregoing reasons, its Order reflecting the same in the above-docketed matter should be affirmed.

BY THE COURT:

_____, J.

ANDREW J. JARBOLA, III

15

*Written notice of the entry of the foregoing Opinion has been provided to each party pursuant to Pa.R.C.P. 236(a)(2) by mailing time-stamped copies to:*

Counsel for The Office of Youth and Family Services:
Gene Talarico, Esquire
Lackawanna County Office of
Youth and Family Services
Lackawanna County Government Center
123 Wyoming Avenue, 4th Fl.
Scranton, PA 18503
talaricolaw@gmail.com

A. Leigh Redmon, Esquire
Lackawanna County Office of
Youth and Family Services
Lackawanna County Government Center
123 Wyoming Avenue, 4th Fl.
Scranton, PA 18503
RedmonL@lackawannacounty.org

Counsel for Appellant/Father:
George E. Gretz, Esquire
Suite 301A, King Building
304 N. Washington Avenue
Scranton, PA 18503
ggretzlaw@evenlink.com

Guardian ad Litem:
Kevin O'Hara, Esquire
Lackawanna County Office of
Youth and Family Services
123 Wyoming Avenue, 4th Fl.
Scranton, PA 18503
OHaraK@lackawannacounty.org