J-A16031-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: R.S.-S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.O., MOTHER | |
| | No. 2376 EDA 2021 |

Appeal from the Order Entered October 22, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0001040-2020

BEFORE:  McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.: **FILED JULY 15, 2022**

L.O. (Mother) appeals the order entered in the Court of Common Pleas of Philadelphia County (juvenile court) adjudicating her daughter, R.S.-S., born in September 2019 (Child) dependent as well as determining that Child is a victim of child abuse as defined by Section 6303 of the Child Protective Services Law (CPSL).[1]  Mother challenges the juvenile court's finding that she was a perpetrator of abuse against Child.[2]  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] This case is a dependency action governed by the Juvenile Act, 42 Pa.C.S. §§ 6301–6375, but also involves child abuse which is defined and addressed by the CPSL, 23 Pa.C.S. §§ 6301-6388.

[2] Father was also found to be a perpetrator of abuse.  He is not a party to this appeal.

**I.**

The relevant facts and procedural history of this case are as follows. The Philadelphia Department of Human Services (DHS) became involved with the family in September 2020 after it received a report that Child had suffered two separate skull fractures within a three-week period, one on the right side of her head and the other on the left. Five of Child's six siblings, ranging in age from 4 to 13 years old, resided in the home at the time.[3] After DHS filed a dependency petition concerning Child, the juvenile court held hearings on July 12, August 24 and October 22, 2021. Witnesses included DHS investigator Jennifer Robinson and Mother.

**A.**

Ms. Robinson testified regarding the first injury that Child sustained was a fracture to the right side of her skull in August 2020 and was taken to nearby St. Christopher's Children's Hospital for treatment. The explanation provided for this injury "was that Mom was in the shower and . . . the other children were watching after [Child] and she fell off the bed." (N.T. Hearing, 7/12/21, at 12-13). The incident was determined to be accidental because Child's injury was consistent with a fall from the bed and the parents were able to explain how the injury occurred. (*See id.* at 13, 25). Hospital staff had conversations with the family emphasizing that Child's siblings should not be caring for her

---

[3] One sibling resided outside of the home with a family member.

and that only Mother and Father should be picking her up. Child was hospitalized for several days for monitoring of the fracture and associated swelling.

Upon receiving the report of Child's second skull fracture, Ms. Robinson interviewed Mother and two of the children at their home. Mother "reported that [Child] was in the play gate area . . .[and] just fell. That she was in the area walking around and she fell." (*Id.* at 15). Child was eleven months old and could stand and was learning to walk.

Ms. Robinson sought additional details from Mother about the incident "because in talking with the doctors at Saint Christopher's they were saying that it was not possible for the child to sustain a skull fracture just from a standing position and falling over. . . . [I]t did not seem likely that . . . a fall from her natural height would cause a skull fracture." (*Id.* at 16-17). Father relayed to Ms. Robinson that he was not home at the time of the incident and posited that Child fell on blankets in the play area.

Because these explanations did not match Child's injury, Ms. Robinson advised Mother and Father during a subsequent visit to the home that the child abuse report would likely indicate abuse. Mother then offered to tell Ms. Robinson "what really happened." (*Id.* at 19). Mother recounted that her nine-year-old daughter L.S.-S. "took [Child] into her room and dropped the baby." (*Id.*). Mother told Ms. Robinson that she heard a "loud boom" when she was asleep and she jumped up and went to L.S-S.'s room where her older

daughter "was just holding [Child] and looked sad." (*Id.*). L.S.-S. explained to Ms. Robinson "that she went into her Mom and Dad's room and they were asleep and the baby was awake. And [she] picked up, took the baby in the room to play with her, and that she fell off the bed." (*Id.* at 20). Father appeared shocked when he heard this explanation and said that he had "no idea" that the accident occurred in this manner. (*Id.* at 21).

Ms. Robinson further testified that when she asked Mother about the changing accounts of Child's injury, Mother indicated that L.S.-S. was afraid to get in trouble because she knew she was not supposed to be holding Child. Mother "explained that she can't stop [the older children] from picking up the baby. That she'll tell them, don't touch the baby and put [Child] in the baby's walker and go to cook and she'll turn around and somebody is walking with the baby." (*Id.* at 22). DHS indicated abuse with regard to this incident based on an egregious lack of supervision. Mother and Father agreed to a safety plan for a family member to care for Child.

**B.**

Mother testified concerning Child's first injury that she was in the shower when her daughter A.S.-S., who was then ten years old, "was playing while the baby was on the bed. She got distracted and the child fell." (*Id.* at 56). Mother took Child to St. Christopher's Children's Hospital the next morning after she felt a bump on Child's head.

Regarding the second incident, Mother explained that while she was taking a morning nap, L.S.-S. came into her bedroom and picked Child up from her playpen. Mother woke up when she heard a "thump" sound and crying. L.S.-S. then told Mother that "she had placed [Child] on the bed and [L.S.-S.] was using her tablet. [L.S.-S.] got distracted and when she got distracted, the baby fell to the ground." (*Id.* at 63). Mother took Child to Albert Einstein Hospital that evening after she felt a bump on Child's head. When asked the reason she brought Child to Albert Einstein Hospital instead of to St. Christopher's Children's Hospital for examination, given that the latter hospital is much closer to her home, Mother admitted that she was afraid to go to St. Christopher's because of the prior report of Child's same injury. (*See id.* at 67-68).

## C.

On October 22, 2021, after the parties argued their respective positions, the juvenile court adjudicated Child dependent and determined that Mother and Father had perpetrated abuse against Child. (*See* N.T. Hearing, 10/22/21, at 29-30). In doing so, the juvenile court noted that Mother had evidenced a consciousness of guilt with regard to Child's second injury because she "drove past St. Christopher's several miles to Einstein Hospital and when pressed to explain that, she admitted freely she did it because she didn't want to get caught twice in the same situation at St. Christopher's." (*Id.* at 30). The court stated its "inescapable conclusion that there was a

reckless and egregious failure to supervise these children, which leads the Court's finding child abuse verses mother and father." (**Id.** at 29-30). It entered its order reflecting these findings that same day. Mother timely appealed and she and the juvenile court complied with Rule 1925. **See** Pa.R.A.P. 1925(a)(2)(i)-(ii). In its Rule 1925(a) opinion, the juvenile court stated that the discrepancies in Mother's testimony demonstrated her "recklessness and an egregious lack of supervision and called into question Mother's credibility." (Juvenile Court Opinion, 3/14/22, at 8).[4]

**II.**

Mother's issues on appeal challenge the juvenile court's finding of child abuse against her.[5] Mother contests the court's application of the evidentiary presumption set forth in Section 6381(d) of the CPSL and she maintains that the evidence shows that Child's injuries were accidental. (**See** Mother's Brief,

_____

[4] Mother retained legal and physical custody of Child. The juvenile court discharged the petition and directed that aftercare services be implemented.

[5] "Our scope of review in child dependency cases is limited in a fundamental manner by our inability to nullify the fact-finding of the trial court. We accord great weight to the hearing judge's findings of fact because the judge is in the best position to observe and rule upon the credibility of the witnesses." **Interest of La.-Ra. W.**, 266 A.3d 1071, 1089 (Pa. Super. 2021) (citation omitted). Given this unique posture, we will not overrule the findings of the trial court if they are supported by competent evidence and our well-settled standard of review "requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the trial court's inferences or conclusions of law." **Id.** (citation omitted).

at 22-38). While Mother concedes that she was "dishonest with the hospital and DHS," she asserts that her explanation, *i.e.*, that she lied to protect her family, was reasonable. (*Id.* at 30). According to Mother, the evidence reflects that she did not leave her children unsupervised for long periods of time and/or on a repeated basis, and that her conduct did not rise to the level of recklessness necessary to support a finding of abuse under the CPSL.[6]

The CPSL governs determinations of child abuse, which trial courts must find by clear and convincing evidence. *See Interest of C.B.*, 264 A.3d 761, 770 (Pa. Super. 2021) (*en banc*), *appeal denied*, 270 A.3d 1098 (Pa. 2022). "Clear and convincing evidence exists when testimony given is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." *Interest of La-Ra.*, *supra* at 1080 (citation omitted).

The CPSL defines child abuse in pertinent part as follows:

**(b.1) Child abuse.**—The term 'child abuse' shall mean intentionally, knowingly or recklessly doing any of the following:

(1) Causing bodily injury to a child through any recent **act or failure to act**.

23 Pa.C.S. § 6303(b.1)(1) (emphasis added).[7]

---

[6] Because Mother's arguments on appeal are interrelated and challenge the finding of abuse, we will address them together for ease of disposition.

[7] Although Mother focuses in her brief on Section 6303(b.1)(7) of the CPSL (defining abuse as serious physical neglect), the juvenile court relied on
*(Footnote Continued Next Page)*

Relevant to the instant case, we have explained that: "In cases where there is no direct evidence to identify the perpetrator of abuse, but the injured child was in a particular responsible party's care when the abuse occurred, Pennsylvania courts rely upon the evidentiary presumption set forth in 23 Pa.C.S. § 6381(d)." *Interest of La.-Ra. W.*, *supra* at 1081. The juvenile court in this case applied this presumption, which Mother contends was inappropriate under the circumstances. Section 6381(d) reads:

> **(d) Prima facie evidence of abuse.**—Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be *prima facie* evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.§ 6381(d).

This provision shifts the burden of proof to the caregiver to establish that he or she did not commit the abuse. It "provides for an 'attenuated' standard of evidence in making a legal determination as to the abuser in child abuse cases where a child has suffered serious physical injury as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child." *Interest of C.B.*, *supra* at 770 (citation omitted). If the caregiver offers no

---

Section (b.1)(1). (**See** Juvenile Ct. Op., at 3; **see also** Mother's Brief, at 38-46).

evidence at all or is not found credible, the presumption of abuse created by Section 6381(d) is not overcome.

Caregivers may rebut this *prima facie* presumption with evidence demonstrating that they "did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive." *Id.* at 772 (citation omitted). "The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by [DHS] and the rebuttal of the parent or responsible person." *Id.*

"A parent does not actually have to be physically present with the child at the time of the abuse for the presumption to apply to that parent." *Id.* (citation omitted). Additionally, "[w]hen a child is in the care of multiple parents or other persons responsible for care, those individuals are accountable for the care and protection of the child whether they actually inflicted the injury or failed in their duty to protect the child." *Id.* at 778 (citation omitted).

Here, the juvenile court found:

> The evidence and testimony clearly indicated that Child suffered serious bodily injury that would not ordinarily be sustained in the absence of some act or omission of Mother being tantamount to child abuse. Specifically, the nature of Child's two skull fractures in three weeks demonstrated an egregious lack of supervision by the Mother who at the time admitted she was unable and unwilling to stop her minor children from handling the Child. Mother also admitted she did not provide Child immediate

medical attention and lied to DHS Investigators in order to avoid the suspicion of child abuse. For these reasons, the finding of child abuse against Mother was clear and convincing.

(Juvenile Ct. Op., at 8-9).

Based on the foregoing and in view of great weight we are to accord the juvenile court's first-hand credibility determinations, which weigh heavily against Mother, we conclude that the court properly applied the Section 6381(d) presumption under the circumstances of this case. It is readily apparent that Mother was "accountable for the care and protection of [Child] . . . [and that she] failed in [her] duty to protect [Child]" by neglecting to supervise her children's handling of Child and in choosing not to seek immediate medical attention following the injury. *See Interest of C.B.*, *supra* at 778.

Concerning Mother's claim the evidence failed to show that she acted with the requisite culpability of recklessness,[8] the record fully supports the juvenile court's conclusion that Mother's failure to supervise her other young children while they were with Child was reckless, especially in light of the

---

[8] "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation." 18 Pa.C.S. § 302(b)(3); *see also* 23 Pa.C.S. § 6303(a) (referring to Section 302 of the Crimes Code for definition of "recklessly" to be used under the CPSL).

severe nature of the first injury Child sustained and the unjustifiable risk that it would reoccur if her other children continued to handle Child. Despite the hospital's discussion with the family regarding the seriousness of the situation, Mother continued to put Child in circumstances where the other children could hold her, after she knew or should have known that these circumstances posed a real danger. Accordingly, we affirm the juvenile court's finding of abuse against Mother.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/15/2022