**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SULTAN FREEMAN | : | |
| | : | |
| Appellant | : | No. 2321 EDA 2023 |

Appeal from the PCRA Order Entered August 25, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0007026-2016

BEFORE: STABILE, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BECK, J.:                    **FILED NOVEMBER 27, 2024**

Sultan Freeman ("Freeman") appeals from the order dismissing his petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA"),[1] entered by the Philadelphia County Court of Common Pleas ("PCRA court"). Freeman raises claims sounding in ineffective assistance of counsel. We affirm.

Freeman was convicted of several crimes stemming from the shooting of his uncle, Ibin Islam ("Islam"), on June 4, 2015. The Commonwealth presented the following evidence to establish Freeman's guilt. Sergeant Randall Goodson responded to an apartment complex and upon arrival was

---

[*] Former Justice specially assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

directed to the ground floor elevator, where Islam was on the floor surrounded by several onlookers. Islam, who had a gunshot wound to his abdomen, was transported by medics for treatment. He was immediately taken for surgery and spoke to Detectives William Knecht and Joseph Knoll the next day, informing them that Freeman shot him when Islam said he could not immediately pay a $1,500 debt. He then crawled to the elevator to seek help. Islam signed and dated each page of an interview form, which included a photograph of Freeman and notation that he was the shooter. Surveillance video established that Freeman entered the apartment's elevator around 5:15 p.m., and depicted Islam crawling towards the elevator at approximately 5:20 p.m.

Islam was the only witness who testified to the shooting. At trial, however, he identified the shooter as his friend, Eric Teegle. He explained that he was at his ailing mother's apartment as he, Freeman, and other family members all helped care for her. After Freeman relieved him that evening, Islam went to the stairwell, where he met Teegle. The two began smoking PCP and got into a fight over money, ending with Teegle shooting him. The next thing he remembered was waking up in the hospital. Islam attributed his contradictory hospital statements to receiving morphine for his injuries as well as using PCP. The bulk of the Commonwealth's case-in-chief therefore relied on the introduction of his prior inconsistent statements to the police as substantive evidence.

Notably, Islam had criminal charges outstanding at the time he was shot. During the pendency of this prosecution, Islam accepted a plea agreement and participated in a presentence interview with Natalie Micche ("Micche"), an employee of the probation department. During the interview, Islam said he had been shot in the stomach by his nephew. Those statements were also introduced as substantive evidence.

Relevant herein, on cross-examination of Islam, Freeman's attorney elicited that he had "said a lot of things" during his presentence interview because he feared his plea deal would be pulled, but counsel did not ask details about the charges. N.T., 7/10/2019, at 42. On cross-examination of Micche, Freeman asked, "What crime was [Islam] convicted of that you were preparing this report for?" *Id.* at 89. The trial court sustained the Commonwealth's objection.

Ultimately, the jury found Freeman guilty of aggravated assault, firearms not to be carried without a license, and possession of an instrument of crime. Separately, the trial court found him guilty of persons not to possess a firearm. The trial court sentenced to an aggregate term of fourteen to twenty-eight years of incarceration. He timely appealed and on May 14, 2021, we discharged the conviction for carrying a firearm without a license as the Commonwealth failed to present evidence concerning concealment. *Commonwealth v. Freeman*, 1046 EDA 2020 (Pa. Super. May 14, 2021) (non-precedential decision). Since that disrupted the trial court's sentencing

- 3 -

scheme, we vacated his judgment of sentence and remanded for resentencing. In all other respects, we affirmed. Our Supreme Court denied Freeman's petition for allowance of appeal.[2] **Commonwealth v. Freeman**, 266 A.3d 1071 (Pa. 2021).

Freeman then filed a timely, counseled PCRA petition on November 10, 2022, raising two claims alleging ineffective assistance of counsel: first, that trial counsel failed to cross-examine Islam with the specific criminal charges he was facing when he spoke to police, as those charges supplied a motivation for Islam to lie; second, trial counsel ineffectively opened the door to statements from third parties to police officers identifying Freeman as a potential suspect.

The PCRA court issued notice of its intent to dismiss the petition without an evidentiary hearing. Freeman did not file a response and the PCRA court thereafter dismissed the petition. Freeman timely appealed and complied with the PCRA court's order to file a concise statement, raising the same two claims pursued in the petition. The PCRA court's responsive opinion concluded that Freeman was not entitled to impeach Islam with the specific convictions, citing Pennsylvania Rule of Evidence 609(a). That Rule sets forth the general rule that a witness may be impeached by evidence of a criminal conviction only if

_____

[2] Freeman's resentencing was postponed pending his petition for allowance of appeal. He was later resentenced to an aggregate term of ten to twenty years of imprisonment.

- 4 -

the crime involved dishonesty or false statements ("crimen falsi"). The PCRA court cited cases holding that neither possession of a firearm nor possessing drugs with intent to deliver—the two crimes to which Islam pled guilty—qualify as crimen falsi. **See** PCRA Court Opinion, 4/2/2024, at 8-9 ("Since [Islam] was not convicted of prior crimin falsi [sic], however, the [c]ourt was correct in precluding this evidence.").[3]

As to the second claim, the PCRA court first concluded that Freeman waived the claim by failing "to cite to any portion of the record or any testimony in particular to support this claim[.]" **Id.** at 12. Alternatively, the PCRA court concluded that Freeman's counsel opened the door to the statements. During cross-examination of Detective Knecht, counsel "elicited testimony … to show that the detective's paperwork included information from other sources who identified [the] shooter as 'Shakeem Freeman' rather than Sultan Freeman." **Id.** Likewise, counsel "also elicited testimony from

_____

[3] The PCRA court believed Freeman's claim concerned the trial court's decision to disallow cross-examination of Micche as to the crimes to which Islam pled guilty. While Freeman's presentation was not the model of clarity, he was referring to trial counsel's failure to impeach Islam during that cross-examination. **See also** Freeman's Brief at 15 (claiming that counsel failed "to confront [ ] Islam with his pending criminal charges and the penalties he was facing"). We note that the PCRA's eligibility requirements require that "the allegation of error has not been previously litigated or waived." 42 Pa.C.S. § 9543(a)(3). Thus, the PCRA court erred by revisiting the original trial court ruling as to the attempted introduction of the prior convictions on cross-examination of Micche, as that error could have been reviewed on direct appeal and claims of trial court error are generally not cognizable under the PCRA. **See Commonwealth v. Ford**, 809 A.2d 325, 329 (Pa. 2002).

Sergeant Goodson that his paperwork listed the shooter as 'Shakeem Jordan' and not Sultan Freeman." ***Id.*** The Commonwealth then asked Detective Goodson to read from his report, in which third parties "also indicated that the shooter was the complainant's nephew." ***Id.*** The PCRA court opined that these were reasonable strategic choices, designed "to re-direct the jury's attention from his client to other possible suspects. Clearly, trial counsel's strategy was to show that there were other suspects whose names sounded like [Freeman]'s who were not investigated by the police." ***Id.*** at 13.

Freeman presents the following two claims for our review.

1. Was trial counsel constitutionally ineffective by failing to confront the Commonwealth's main witness, who was [the] victim of the shooting, or present extrinsic evidence regarding the witness/victim's specific criminal charges pending against him when he made his prior statements to a detective and probation officer implicating [Freeman] in the shooting in violation of [Freeman]'s confrontation rights under the Sixth Amendment to the United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution and in light of the Supreme Court's holding in ***Davis v. Alaska***, 415 U.S. 308 (1974)?

2. Was trial counsel constitutionally ineffective by allowing into evidence inadmissible and incriminating hearsay from police witnesses who testified that out-of-court declarants said or implied [Freeman] was the shooter in violation of [Freeman]'s constitutional rights to confrontation and to a fair trial?

Freeman's Brief at 4.

Our standard of review is well-settled:

Our review of a PCRA court's decision is limited to examining whether the PCRA court's findings of fact are supported by the record, and whether its conclusions of law are free from legal error. We view the findings of the PCRA court and the evidence of record in a light most favorable to the prevailing party.

- 6 -

*Commonwealth v. Wilson*, 273 A.3d 13, 18 (Pa. Super. 2022) (citations omitted).

Both claims challenge trial counsel's stewardship, alleging violations of Freeman's right to effective counsel under both the federal and state constitutions. The United States Supreme Court has "recognized that the Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684 (1984). That necessarily includes a right to effective assistance. *Id.* at 686. Counsel is presumed effective, and a petitioner must establish two components to receive relief. First, "that counsel's performance was deficient." *Id.* at 687. Second, that the defective performance was prejudicial. Prejudice is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Our Supreme Court has held that Article I, Section 9 of the Pennsylvania Constitution carries the same level of protection as its federal counterpart. *See Commonwealth v. Pierce*, 527 A.2d 973, 976 (Pa. 1987). That court has "refined the *Strickland* performance and prejudice test into a three-part inquiry." *Commonwealth v. Spotz*, 84 A.3d 294, 311 (Pa. 2014). The petitioner must plead and prove the following three prongs: "(1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for

his action or inaction; and (3) the petitioner suffered actual prejudice as a result." *Id.* (citation omitted). "If a petitioner fails to prove any of these prongs, his claim fails." *Commonwealth v. Simpson*, 66 A.3d 253, 260 (Pa. 2013). We may affirm the denial of PCRA relief on any ground supported by the record. *Commonwealth v. Parker*, 249 A.3d 590, 595 (Pa. Super. 2021).

Freeman's first claim contains several components, but, at bottom, the claim is that trial counsel ineffectively failed to ensure that the jury knew Islam had pending firearm and drug charges at the time he made statements to police and Micche. Freeman's Brief at 16. Freeman argues that the PCRA court misconstrued his claim by exclusively focusing on the fact that those charges do not qualify as crimen falsi. *Id.* He maintains that under *Alaska v. Davis*, 415 U.S. 308 (1974), the jury was entitled to assess whether Islam had a subjective motivation to lie, and that this motivation exists regardless of whether the crimes would be admissible to impeach Islam's credibility. *Id.* at 14. The Commonwealth, for its part, adopts the PCRA court's rationale in that regard and adds that the claim lacks arguable merit, focusing on the fact that neither offense was crimen falsi. Commonwealth's Brief at 9-10 ("[Islam]'s prior convictions were not crimen falsi, making them inadmissible. Therefore [Freeman] cannot establish arguable merit to his underlying claim.")

We first review ***Davis***. In that case, the United States Supreme Court determined that a state rule shielding a juvenile adjudication of delinquency must yield to Davis' confrontation rights under the circumstances. ***Davis***, 415 U.S. at 318. Davis was arrested and charged with stealing a safe that was discovered near the home of Jess Straight. ***Id.*** at 309. Straight's stepson, Richard Green, who was on probation following a juvenile adjudication of burglary, implicated Davis in the theft when interviewed. ***Id.*** at 309-10. Green "was a crucial witness for the prosecution." ***Id.*** at 310.

The State moved to bar admission of any reference to Green's probationary status pursuant to a statute protecting juveniles, which Davis opposed. He "made it clear that he would not introduce Green's juvenile adjudication as a general impeachment of Green's character as a truthful person but, rather, to show specifically that at the same time Green was assisting the police in identifying petitioner he was on probation for burglary." ***Id.*** at 311. The trial court denied the request, and the Supreme Court reversed. The Court began by stressing the importance of cross-examination, "the principal means by which the believability of a witness and the truth of his testimony are tested." ***Id.*** at 316. Introducing evidence of a prior conviction is "a general attack on the credibility of the witness," whereas "revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues" in the case are "a more particular attack" on credibility. ***Id.*** While the trial court permitted Davis to ask Green if he

was biased, "counsel was unable to make a record from which to argue why Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Id.* at 318. This violated his confrontation rights.

The Commonwealth and the PCRA court did not address Freeman's citation to *Davis*. Instead, the PCRA court relied on Rule 609(a), which permits what the *Davis* Court described as "general attacks" on a witness' credibility based on crimen falsi convictions. In contrast, the line of impeachment that Freeman argues should have been pursued is a more specific attack and would not be used to suggest that Islam is not a credible witness generally. Instead, the criminal charges and subsequent conviction would aid the jury in determining whether, in this particular instance, Islam had something to gain by lying, i.e., potential favorable treatment with respect to the criminal charges he was facing. Therefore, there is arguable merit to the claim that Freeman's attorney could have sought to introduce the specific charges.[4]

---

[4] While we accept that the underlying argument has arguable merit, we do not suggest that the trial court would be required to allow Freeman to cross-examine Islam on the specific charges. "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). *See also Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) ("It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness.").

However, Freeman fails to establish that he was prejudiced. "Not every denial of an accused's right to cross-examine with respect to an unrelated case requires a new trial." **Commonwealth v. Mullins**, 665 A.2d 1275, 1279 (Pa. Super. 1995) (citing **Van Arsdall**, 475 U.S. at 681). "Surmounting **Strickland**'s high bar is never an easy task," **Padilla v. Kentucky,** 559 U.S. 356, 371 (2010), and the error must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." **Strickland**, 466 U.S. at 687. We find that the result is reliable notwithstanding any failure to impeach Islam because Islam's testimony was such that, if believed by the jury, it would have fully exonerated Freeman. The United States Supreme Court has reiterated that "the right to confrontation is a *trial* right, **Pennsylvania v. Ritchie**, 480 U.S. 39, 52 (1987), and cross-examination is thought to best get to the truth because "[i]t is always more difficult to tell a lie about a person 'to his face' than 'behind his back.'" **Coy v. Iowa**, 487 U.S. 1012, 1019 (1988). Here, Islam was not an adversarial witness at trial and was not lying to Freeman's face because his testimony was that Teegle, and not Freeman, was the shooter. Thus, evidence that Islam had a motive to lie when he inculpated Freeman would have no conceivable effect on the jury's assessment. Whatever value would be gained by showing that Islam previously had a motive to lie outside of court is minimally helpful in comparison to his insistence to the jury, under oath, that Teegle shot him.

Freeman attempts to evade this conclusion by emphasizing that the Commonwealth relied on Islam's prior statements. Thus, his credibility at that time was at issue, and it follows that the jury should have been allowed to consider what charges Islam was facing when he made the prior statements. Freeman's Brief at 14-15 ("[T]rial counsel should have introduced this evidence to allow the jury to determine whether [] Islam might have been initially motivated by hopes of favorable treatment at the time in the event the jury chose to believe he actually made those past statements."). We again conclude that Freeman cannot establish prejudice. Notably, Islam claimed memory loss, telling the jurors that he did not remember speaking to the police at the because of a combination of ingesting PCP and receiving morphine for his injuries. As a practical matter, arguing to the jury that Islam consciously chose to pin the crime on Freeman in a quest to receive favorable treatment from the Commonwealth would undermine Islam's trial testimony that he was too high to know what he was saying at the hospital. Therefore, counsel was not ineffective for failing to impeach Islam with his prior convictions.

Freeman's second claim alleges that trial counsel ineffectively opened the door to hearsay evidence. Freeman's Brief at 17. We agree with the PCRA court and the Commonwealth that this claim is waived, as Freeman fails to cite any portion of the record. *See* Pa.R.A.P. 2119(c) ("If reference is made to … any other matter appearing in the record, the argument must set forth,

in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears."). Freeman merely alludes to generic descriptions of the purported hearsay statements. This is insufficient under our rules. *See Commonwealth v. McIntyre*, 314 A.3d 828, 850 (Pa. Super. 2024) (deeming claim waived: "[McIntyre] does cite testimony he seems to argue was contradictory, but he does not make any reference to where that testimony can be found in the record in violation of Pa.R.A.P. 2119(c)"). It is not this Court's responsibility to scour the entire transcript and identify which statements were potentially problematic. *See Commonwealth v. Beshore*, 916 A.2d 1128, 1140 (Pa. Super. 2007).

Alternatively, even if preserved we again conclude that Freeman has failed to establish prejudice. Indeed, based on the summary set forth in Freeman's brief it is clear that he was not prejudiced. Freeman argues:

> In the present case, the inadmissible and damaging hearsay presented to the jury included (1) Detective Knecht's testimony that he developed [Freeman] as a suspect based on interviews of family members and neighbors, (2) Detective Knecht's testimony that Lieutenant Davis told him that [] Islam said that [Freeman] - his nephew - was the shooter, and (3) Sergeant Goodson['s] testimony that other out-of-court declarants told him that [Freeman] - his nephew - was the shooter. Neither Lieutenant Davis nor any of the other out-of-court family members, neighbors or declarants were called as witnesses at trial.
>
> There can be little debate over the hearsay nature of these statements.

Freeman's Brief at 18.

- 13 -

We do not agree that it is obvious these statements constituted hearsay, which is definitionally a statement offered for the truth of the matter asserted. Pa.R.E. 801(c)(2) ("'Hearsay' means a statement that … a party offers in evidence to prove the truth of the matter asserted in the statement."). Freeman concedes that Detective Knecht used the statements to develop Freeman as a suspect, which means their value was in explaining his course of conduct. *See Commonwealth v. Cruz*, 489 414 A.2d 1032, 1035 (Pa. 1980). ("[A]n out-of-court statement offered to explain a course of conduct is not hearsay.") For example, on cross-examination Detective Knecht was asked why he had a photo of Freeman when he spoke to Islam at the hospital. He replied, "Because there were other interviews done of the medics. There were interviews done of the defendant's family, multiple family members. There were interviews done with neighbors of the defendant. And we were able to obtain information from inside the apartment." N.T., 7/10/2009, at 75. Even assuming this exchange implicitly represents that these unnamed parties named Freeman as the shooter, they were not used for their truth.

Freeman also complains about statements made by Lieutenant Keith Davis to Detective Knecht, presumably referring to this exchange on re-direct examination:

> Q. Detective, if I can direct your attention to C-8, the statement that you took from Lieutenant Keith Davis from fire and rescue. Did Lieutenant Davis indicate what [] Islam's first response was when asked who did this to him?

*  *  *

A. He said, "I asked the victim, 'Who did this to you?' He stated, 'My nephew shot me.' I asked, 'What is your nephew's name?' He said, 'Shakeem Freeman.'"

*Id.* at 83-84.

As the PCRA court explains in its opinion, this exchange was in response to counsel's cross-examination of Detective Knecht. For example, the following exchange occurred on cross:

Q. What efforts did you make to determine whether he had a nephew by the name of Shaheem?

A. Shaheem?

Q. Correct.

A. I didn't.

Q. What about Shakeem?

A. I didn't.

Q. What about Shaheed?

A. I didn't.

*Id.* at 78.

We agree with the PCRA court that the alleged double hearsay (what Islam told Lieutenant Davis, which in turn was related to Detective Knecht) was not used for its truth but rather to show the developing investigation and why the name Shakeem appeared in the paperwork. PCRA Court Opinion, 4/2/2024, at 12. Moreover, the Commonwealth was obviously not using the

statement for its literal truth, i.e., that another nephew named Shakeem Freeman shot Islam.[5]

Our conclusion that these statements were not hearsay establishes that Freeman's confrontation rights were not violated. Freeman argues that these statements prejudiced him because only Islam identified him as the shooter, and he recanted that allegation. **See** Freeman's Brief at 17-18 ("Testimonial hearsay also offends the essential concept that an accused has a fundamental right to confront his accuser.") (citing **Crawford v. Washington**, 541 U.S. 36 (2004)). Even if we assume that the statements were testimonial, the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." **Crawford**, 541 U.S. at 59 n.9. **See also Commonwealth v. Dargan**, 897 A.2d 496, 500 (Pa. Super. 2006) ("A statement admitted for a purpose other than establishing the truth of the matter asserted — such as, in this case, the investigating officers' course of conduct — does not violate the Confrontation Clause."). Because his prejudice argument relies on the premise that

_____

[5] Freeman's argument in his brief illustrates why waiver is an appropriate sanction for failing to cite the record. Freeman's argument describes the statement of Lieutenant Davis as introduced through Detective Knecht relating that Islam blamed Freeman, but the testimony shows Islam said "his nephew" followed by the name Shakeem Freeman. Thus, Freeman wrongly asserts that the statement named Freeman himself as the culprit, and trial counsel argued that the Commonwealth failed to investigate any other nephew.

introducing the statements violated his constitutional rights, he has failed to carry his burden.

Order affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/27/2024